**Children's Fast Track**


IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

|  |  |
|---|---|
| IN RE: A.J.R.-H. AND I.G.R.-H.<br><br>APPEAL OF: K.J.R., MOTHER | : No. 38 MAP 2017<br>:<br>: Appeal from the Order of Superior<br>: Court at No. 1564 MDA 2016 dated<br>: May 1, 2017 Affirming the Decree of<br>: the Berks County Court of Common<br>: Pleas, Orphans' Court, dated August<br>: 23, 2016 at Nos. 84695 and 84696<br>:<br>: ARGUED: March 6, 2018 |

## OPINION

**JUSTICE DONOHUE**                              **DECIDED: July 18, 2018**

This discretionary appeal involves the propriety of the en masse admission of 167 exhibits at a hearing to involuntarily terminate the parental rights of K.J.R. ("Mother") and D.W.H. ("Father") to their minor daughters, A.J.R.-H. and I.G.R.-H. (collectively, the "Children").[1] As the record in this matter fails to support a finding that the exhibits satisfied the business records exception to the prohibition against the admission of hearsay, we conclude that the orphans' court erred by admitting them on this basis. *See* 42 Pa.C.S. § 6108(b); Pa.R.E. 803(6).[2] We further conclude that the Superior Court incorrectly found

---

[1] At the time of the termination, I.G.H.-R. was seven and A.J.H.-R. was nine years old.

[2] Section 6108(b) provides: "A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the

that this error was harmless. We therefore vacate the decrees terminating Mother's parental rights and remand the matter to the orphans' court for a new termination proceeding.[3]

## I. Facts and Procedural History

On February 19, 2016, Berks County Children and Youth Services ("CYS") filed petitions to terminate the parental rights of Mother and Father to the Children pursuant to

---

tribunal, the sources of information, method and time of preparation were such as to justify its admission." Similarly, Rule 803(6) allows the admission of a record of a regularly conducted activity if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6).

[3] The orphans' court also involuntarily terminated the parental rights of Father at the same proceeding. Father appealed the decree to the Superior Court, which affirmed in an unpublished decision. *See In re: A.R.-H and I.R.-H*, 1606 MDA 2016 (Pa. Super. May 1, 2017) (unpublished decision). Like Mother, Father also challenged the admission of the documentary evidence, and the Superior Court affirmed on the same basis as it did in Mother's case. Father, however, did not seek further review before this Court, rendering the termination of his parental rights final.

section 2511(a)(1), (2), (5), (8) and (b) of the Adoption Act.[4] As to Mother, CYS alleged that termination was warranted because of her inability to appropriately parent the

---

[4] The pertinent provisions of the statute provide:

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the

Children; her failure to obtain and maintain appropriate and stable housing; her failure to obtain and maintain a stable and legal source of income; her failure to remediate her substance abuse problems; ongoing concerns about her mental health; and ongoing concerns regarding domestic violence. Petition for Involuntary Termination of Parental Rights, 2/19/2016, ¶ 10.

The orphans' court convened a hearing on the petitions on August 12, 2016. At the inception of the proceeding, prior to calling any witnesses to testify, the county solicitor representing CYS moved for the admission of Exhibits 1 through 168. The exhibits, spanning more than 1230 pages, covered a wide range of subjects from an array of sources and authors. Included were

- referrals made by anonymous reporting sources to CYS about the family dating back to 2007;

- dependency petitions filed by CYS on December 31, 2013 regarding the Children;

- numerous psychological and domestic violence evaluations of Mother, Father and the Children conducted by a variety of licensed psychiatrists, psychologists, professional counselors and clinical social workers from Open Door International, Inc. ("ODI"), Berks Counseling Associates, P.C., and Commonwealth Clinical Group;

- drug and alcohol treatment evaluations pertaining to Mother and Father from Treatment Access and Services Center, Inc. ("TASC");

- substance abuse monitoring and urinalysis reports for Mother and Father from an unidentified agency[5] documenting attendance and results;

---

parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), (b).

[5] Some of the entries in the docket, as well as the CYS-created summary of exhibits contained in Exhibit 161, indicate that the urinalysis reports were from TASC. The reports

- reports documenting observations and conversations by several different in-home services caseworkers from ODI;

- reports documenting supervised visits between the Children and each parent conducted by various caseworkers from ODI;

- reports from domestic violence counseling sessions with Father by ODI;

- reports from counseling sessions with Father by Pennsylvania Counseling Services;

- treatment progress summaries and reports from counseling sessions with Mother by Andrea Karlunas of Commonwealth Clinical Group;

- reports from counseling sessions for Mother from Pennsylvania Counseling Services;

- reports regarding Mother's inpatient drug treatment at Gaudenzia Fountain Springs ("Gaudenzia");

- emails sent and received by various CYS caseworkers from third-party service providers working with the family;

- notes from telephone conversations that various CYS caseworkers had with third-party service providers;

- police reports and affidavits of probable cause involving Father and Mother;

- court orders from the dependency case involving the family;

- printouts of criminal, civil and traffic dockets detailing the outcome of various court actions brought against Mother and Father;

- a typed summary of Father's criminal history spanning from 1987 through 2014 complied by an unknown author using unlisted sources;

- a protection from abuse ("PFA") petition filed against Father by Mother in 2013, the temporary PFA order that resulted, and the order subsequently dismissing it based on Mother's failure to appear for the final hearing;

- PFA violation notices, arrest warrants, and adjudications from 1990 and 1994 wherein Father was the defendant but Mother was not the victim;

---

themselves, however, contain no notation as to the agency involved or the individual that tested the specimens and/or authored the reports.

- tax documents for Father (Forms 1099-MISC) for 2014 and 2015;

- letters and cards Father sent to the Children and to their caregiver;

- writings and drawings by the Children regarding their safety and their observations of drug/alcohol use by Mother and Father and domestic violence, with no indication as to who worked with the Children on these projects or, in some instances, which child completed the work;

- a seventy-three-page summary of all of the exhibits as well as events related to the family ranging from March 24, 2007 through July 11, 2016 and impressions of the case, authored by CYS caseworker Nicole Kauffman-Jacoby ("Kauffman-Jacoby"), prepared for the termination hearing on July 12, 2016;

- CYS's family service and permanency plans for the family;

- handwritten and unsigned "resource parent monthly reports," detailing the Children's activities, medical visits, and behaviors; and

- reports from the Children's mobile therapist, Cherrie A. Sage, M.A., of Commonwealth Clinical Group.

Mother and Father both objected to the admission of the documents on grounds of hearsay, confrontation, relevance, and absence of certification. Father additionally objected to the admission of evidence regarding the 1994 PFA violation (Exhibit 124), as the charges had been dismissed.[6] The orphans' court sustained the objection to Exhibit 124 and also initially sustained the hearsay objection to Exhibit 161, the CYS-created summary of the exhibits and of the case as a whole.

As to "[t]he rest of the exhibits," the orphans' court asked the solicitor whether they were contained in CYS's file, and the solicitor said that they were. N.T., 8/12/2016, at 18-19. The court then questioned, "They were collected in the ordinary course of business

---

[6] The solicitor representing CYS was aware that the charges had been dismissed, but stated that CYS included the documents "to make the [c]ourt aware of it." N.T., 8/12/2016, at 18.

with regard to this case?" to which the solicitor responded, "They are business records, Your Honor, yes." *Id.* at 19. On that basis, and without inquiring about or otherwise discussing the content, timing of the preparation of the documents, author or subject matter of any of the exhibits, the orphans' court overruled the parents' objections "as to the remaining exhibits." *Id.*

The orphans' court then entertained additional argument regarding the admissibility of Exhibit 161, which the county solicitor referred to as "termination testimony." *Id.* at 21. The county solicitor argued that because Kauffman-Jacoby, the caseworker who had authored the document, was going to testify, the exhibit was admissible. She further stated that the orphans' court routinely allowed the admission of "termination testimony" exhibits in other cases. The orphans' court agreed with the county solicitor, and stated its belief that an unnamed decision by the Superior Court had recently held that such a CYS-created summary was admissible in a termination proceeding. The guardian ad litem ("GAL") representing the Children added that some of the exhibits date back to 2013, and the caseworkers who were working with the family at that time were no longer employed by CYS, making it "obvious [that] the information was contained in business records." *Id.* at 22. Thereafter, the orphans' court changed its ruling regarding Exhibit 161 and found it to be admissible.

The hearing then proceeded. CYS called three witnesses in support of its petition. First, Andrea Karlunas ("Karlunas")[7] of Commonwealth Clinical Group ("CCG") testified as an expert in domestic violence treatment and mental health. She testified regarding

---

[7] Karlunas is a licensed clinical social worker, certified sex offender treatment specialist, and a certified domestic violence counselor.

her treatment of Mother as her domestic violence counselor, which ceased prior to Children's removal from her care in November 2014. She also testified regarding her evaluation of the Children and her recommendation that they receive behavioral health services based on the trauma they had witnessed. She stated that she observed improvements in the Children following their receipt of behavioral health services and continued placement with their maternal grandparents.

It was Karlunas' expert opinion that Mother "would have to demonstrate long term sustainability in substance abuse, mental health, employment and housing before she could parent her children." *Id.* at 66. Based on unidentified reports that were provided to her on the day of the hearing, Karlunas expressed concern regarding the parents' failure to resolve their domestic violence issues, the recurrence of which she said would "further traumatize" the Children. *Id.* at 36-37. She testified that it is "critical" for the Children to live "in a safe, secure environment" so that they can "learn to bond and to trust again," and to "develop healthy relationships later on in their own life [sic] and that they are able to identify what is healthy vs. unhealthy in their lives as well." *Id.* at 47.

The second witness to testify was CYS caseworker Kauffman-Jacoby. Kaufmann-Jacoby was assigned as the agency caseworker for the family around the time CYS filed the petitions to terminate Mother's and Father's parental rights to the Children. Thus, as of the termination hearing, she had been working with the family for approximately six months.

Nonetheless, Kauffman-Jacoby provided testimony regarding CYS's involvement with the family, including referrals received between 2007 and 2013, the 2013 dependency petitions filed by CYS, and the 2014 removal of the Children from their

parents' care.[8] She testified regarding Mother's failure to fully comply with all of her court ordered goals – which included cooperation with mental health services, drug and alcohol treatment, domestic violence therapy, casework services, maintaining legal and stable housing and income, parenting classes, and visitation with the Children – following the Children's removal from her care. She also testified that although Father had cooperated with most of the required services, including dual diagnoses treatment, domestic violence counseling, urinalysis, and parenting classes, CYS remained concerned that he had not changed or made sufficient progress. According to Kauffman-Jacoby, CYS was requesting to terminate the parents' rights "[b]ased on the length of time this case has been open and all the services that have been put in place," and the absence of progress observed by either Mother or Father, particularly concerning domestic violence. *Id.* at 85.

Kauffman-Jacoby acknowledged that much of her testimony was "based on reports from prior caseworkers as well as casework providers ... not ... associated with [CYS]." *Id.* at 102. At various points throughout her testimony, Kauffman-Jacoby referred to her written summary of the case (Exhibit 161) to answer questions posed to her about the family. She provided very little testimony based on her interactions with or firsthand knowledge of the members of the family and the events that had occurred that formed the basis of the termination petition.

---

[8] We note that during her testimony, Kauffman-Jacoby incorrectly stated that CYS filed the petitions for dependency in December 2014 and that the Children were removed from their parents' care in April 2015. *Compare* N.T., 8/12/2016, at 79, *with* Exhibits 10-11; *compare* N.T., 8/12/2016, at 79, *with* Exhibits 71-72.

The last witness to testify on behalf of CYS was Sloane Radcliffe, a Child Prep worker from Diakon.[9] Although she was the supervisor of the prior Child Prep worker, Radcliffe did not work directly with the Children until May of 2016. She testified regarding drawings and collages the Children had made with their prior Child Prep worker depicting a safe home (their grandparents' home) and an unsafe home (their parents' home) and things they experienced that made them feel safe or unsafe. She further testified, based on her conversations with the Children, that they did not feel safe living with their parents, explaining that the Children were afraid of certain situations that occurred "and an unstable household." *Id.* at 132.

Father and Mother also testified at the termination hearing. As discussed in greater detail later in this Opinion, Mother and Father contested and attempted to refute much of Kauffman-Jacoby's testimony regarding their compliance with their court ordered goals. Father testified that he successfully completed of all of his court ordered goals, cooperated with every service provider, and about the love he has for his daughters. He acknowledged some incidents of domestic violence and arguing with Mother, but denied others, in particular, the incident allegedly recounted by the Children when he held a gun to Mother. He stated that he and Mother have not had any problems since the Children's removal from their care. He attributed the violence to his use of alcohol, but testified that he has been sober since 2014. He admitted to continuing to see Mother, testifying that

---

[9] According to Radcliffe's testimony, "Child Prep is brought to foster homes to specifically work with the children to help them understand how they entered care, process their thoughts and feelings about that[,] when the time comes to talk about what comes next in their case," and "address some of the trauma they incurred in the past as well." N.T., 8/12/2016, at 123-24.

they were "trying to co-parent together," and that they were "somewhat friends." *Id.* at 158.

Mother testified regarding her fulltime employment, her cooperation with domestic violence and mental health counseling, her completion of drug and alcohol treatment and her compliance with urine screens. She acknowledged her prior substance abuse problem (admitting that her drug of choice was K2), but stated that she has been clean for sixteen months. Mother further testified that she now lives on her own, away from Father, but stated that she continued to maintain a relationship with Father. According to Mother, the last episode of domestic violence between the parties occurred prior to the Children's removal, and although she agreed that they had made mistakes in the past, it was her desire to "forgive and forget." *Id.* at 170-71.

At the conclusion of the hearing, the orphans' court took the matter under advisement. On August 23, 2016, following its "review [of] the testimony and voluminous exhibits," the orphans' court filed decrees terminating Mother's parental rights to the Children, finding that CYS had satisfied its burden of proving the facts alleged in the petition by clear and convincing evidence. Final Decree, 9/23/2016; Orphans' Court Opinion, 10/25/2016, at 1. Following Mother's appeal to the Superior Court, the orphans' court issued an opinion pursuant to Pa.R.A.P. 1925(a) addressing Mother's challenges to the sufficiency of the evidence to support termination and the court's decision to admit the 167 documents into evidence.

Regarding Mother's challenge to the admission of the exhibits proffered by CYS, the court justified its evidentiary ruling on the basis that "[a]uthentication by the scrivener

of each individual report, evaluation, progress note, or drawing is not required." Orphans' Court Opinion, 10/25/2016, at 10.

> It is not essential ... to produce either the person who made the entries or the custodian of the records at the time the entries were made. Moreover, the law does not require that a witness qualifying business records even have personal knowledge of the facts of the reported. ... As long as the authenticating witness can provide sufficient information relating to the preparation and maintenance of the records to justify a presumption of trustworthiness.

*Id.* at 11 (quoting *Commonwealth v. Wood*, 637 A.2d 1335, 1350 (Pa. Super. 1994) (ellipses supplied). Based on "the caseworker's identification of the exhibits as well as the entirety of the record," the orphans' court found that there was a sufficient basis for it to conclude that all of the exhibits, which were part of CYS's records, "were prepared simultaneously with the information being obtained and maintained as business records." *Id.*

In a unanimous, unpublished memorandum decision, the Superior Court affirmed. *See In re A.J.H. and I.G.H.*, 1564 MDA 2016, 2017 WL 1573229 (Pa. Super. May 1, 2017) (non-precedential decision). Reviewing Mother's evidentiary claim, the Superior Court began by reciting the business records exception to the prohibition against the introduction of hearsay. *Id.* at *9 (citing Pa.R.E. 803(6); 42 Pa.C.S. 6108(b)). It then set forth the following standard for finding harmless error:

> (1) the error did not prejudice the defendant or the prejudice was de minimus; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence ... was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id.* (quoting *Commonwealth v. Markman*, 916 A.2d 586, 603 (Pa. 2007)).

Although Mother challenged the admission of all of the exhibits based on the absence of any showing of compliance with the prerequisites for admission under the business records exception, the Superior Court disregarded the claim as to all but a few of the documents. Limiting its focus to two types of documents that potentially contained hearsay statements – the CYS-created summary and documents that contained statements of diagnosis and opinion – the intermediate appellate court found that Mother failed to establish that she was prejudiced by the admission of these documents. The Superior Court recognized that the orphans' court made no determination as to whether hearsay statements appearing within the documents qualified for an exception to the prohibition against hearsay. Nonetheless, without conducting an analysis of whether admission of the exhibits was proper, and without discussing any of the bases for finding harmless error, the Superior Court instead found that Mother failed to establish "how she was harmed" by the admission of the documents, "particularly as the testimony presented at the hearing provided sufficient support for ... termination." *Id.* It therefore concluded that Mother was not entitled to relief.

## II. Issues and Arguments

We granted Mother's petition for allowance of appeal to address whether the 167 exhibits were admissible where the documents comprising the exhibits "were not authenticated, submitted for the truth of the matter asserted therein, contained medical/psychiatric opinions and diagnosis and did not fall under any hearsay exception." *In re A.J.H. and I.G.H.*, 169 A.3d 1078 (Pa. 2017) (per curiam). If the exhibits were improperly admitted, we must further determine whether the Superior Court misapplied

the law by concluding that admission of these exhibits constituted harmless error. *Id.* at 1079.

Mother asserts that CYS failed to establish the prerequisites for admission of the 167 exhibits under the business records exception. According to Mother, many of the documents contained multiple levels of hearsay, as well as statements of diagnosis and opinion, none of which fall under the business records exception, and which CYS failed to address in its proffer to the orphans' court.

She further argues that the error of admitting these exhibits was not harmless, and their admission prejudiced her, as the exhibits detailed her noncompliance with services and her family service plan goals, which was the basis for termination. Mother states that much of the live testimony provided by CYS was based upon the exhibits themselves, as the witnesses did not have firsthand knowledge of this information. Relying on precedent from this Court, Mother states that a court must base a decree terminating parental rights solely on competent evidence. Mother's Brief at 20 (citing *In re Sanders Children*, 312 A.2d 414, 417 (Pa. 1973)). Because the 1925(a) opinion authored by the orphans' court reveals that it did not base its decision only on testimony by witnesses with firsthand knowledge of the events to which they testified, Mother states that we must reverse its decision.

CYS counters that the testimony by the witnesses it presented satisfied its burden of proving that termination of Mother's parental rights was warranted. In so arguing, CYS contends that the CYS-created summary (Exhibit 161) was not hearsay because it was prepared by Kauffman-Jacoby, she testified to its contents and was available for cross-examination. CYS further asserts, without explanation, that the information contained in

the summary (i.e., the remaining exhibits) was admissible under the business records exception of Rule 803(6).

Echoing the Superior Court, CYS argues that even if admitting the exhibits was error, Mother failed to show that she was harmed by this error, as the testimony presented by the witnesses, including Mother, supported termination. Further, CYS states that the witnesses provided testimony that was "substantially similar" to the information contained in the documents, which also rendered the error harmless. CYS's Brief at 19.

The Children's GAL agrees with CYS that the exhibits were properly admitted as business records, stating that CYS "identified the documents as having been made and kept by it in the ordinary course of its business and as being part of its files on these particular cases." GAL's Brief at 10 (citing N.T., 8/12/2016, at 19). The GAL further asserts that denying admission of the CYS file "would unrealistically hamper" termination proceedings, as "welfare agencies unfortunately have a high worker turnover." *Id.*

### III. Admissibility of the Exhibits

We begin our discussion by acknowledging that the decision of whether to admit or exclude evidence is within the sound discretion of the orphans' court. *Commonwealth v. Johnson*, 160 A.3d 127, 143 n.14 (Pa. 2017), *cert. denied sub. nom, Johnson v. Pennsylvania*, 138 S. Ct. 508 (2017). A reviewing court will not disturb these rulings absent an abuse of discretion. *Id.* Discretion is abused if, inter alia, the orphans' court overrides or misapplies the law. *Commonwealth v. Batts*, 163 A.3d 410, 434 n.9 (Pa. 2017).

"Hearsay" is "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the

matter asserted in the statement." Pa.R.E. 801(c). Under the Pennsylvania Rules of Evidence, hearsay evidence is incompetent and inadmissible unless it meets an exception set forth in the Rules or one prescribed by this Court or statute. Pa.R.E. 802. One such exception to the prohibition against hearsay, at issue in this case, is commonly known as the business records exception, which permits the admission of:

> A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:
>
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6). *See also* 42 Pa.C.S. § 6108(b) ("A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.").

Without question, the manner in which these exhibits were admitted into evidence in the first instance failed to satisfy the requirements of the business records exception.

CYS did not present any witness in support of the exhibits' admission, let alone "the custodian or other qualified witness." *See* 42 Pa.C.S. § 6108(b); Pa.R.E. 803(6)(D). Instead, all of the exhibits were presented to the court for admission, in bulk, by the county solicitor prior to calling any witnesses to testify. N.T., 8/12/2016, at 16. There was also no testimony of record that someone with knowledge created any of the 167 exhibits at or near the time of the event or that they were created in the regular practice of the various agencies from which the documents came. *See* 42 Pa.C.S. § 6108(b); Pa.R.E. 803(6)(A), (C). Additionally, none of the documents were certified copies. *See* Pa.R.E. 803(6)(D), 902(11).[10] The only information provided at the time of the exhibits' admission was the county solicitor's assurance, in response to the leading question posed by the orphans' court, that the exhibits were contained in CYS's files and "were collected in the ordinary course of business with regard to this case." N.T., 8/12/2016, at 18-19; *see* 42 Pa.C.S. § 6108(b); Pa.R.E. 803(6)(B).

Our review of the record also does not support the orphans' court's conclusion that Kauffman-Jacoby or any of the other witnesses remedied this initial failure during their testimony. A great majority of the exhibits originated from an agency or individual other than CYS.[11] Some of the exhibits were comprised of multiple documents that recounted

---

[10] Rule 902 provides that certain documents are "self-authenticating," and thus "require no extrinsic evidence of authenticity to be admitted," including, inter alia, "The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with Pa.R.C.P. [] 76. ... ." Pa.R.E. 902(11).

[11] The only CYS-created exhibits included Exhibits 1-3 (CYS incident sheets created by K. High, 3/24/2007, C. Millan, 2/21/2013, and Maureen Majka, 9/23/2013, respectively), 10-11 (petitions for dependency drafted by Cecily Pachuilo, 2/31/2013), 32, 48, 52, 137 (telephone conversations memorialized by Cecily Pachulio, 4/15/2014, 6/26/2014, 8/26/2014, 6/2/2015, and respectively), 44 (motion seeking removal of Children verified

events, observations and conversations that occurred over several weeks or months.[12] Several of the exhibits contained documents composed by multiple authors, none of whom testified at the hearing.[13] Others contained no notation as to the agency from which the document originated or who authored the document.[14] There were emails and reports that documented conversations that occurred between individuals who did not testify and/or who did not author the document in question.[15] And there were printouts of court

_____

by Kimberly Reinert, 10/24/2014), 48 (telephone conversation memorialized by Cecily Pachuilo, 4/15/2014), 113, 150 (drug assessment referral forms for Mother, 12/17/2014, and Father, 3/20/2015, authored by Ashlea Mellinger), 137, 148-49 (telephone conversations memorialized by Kauffman-Jacoby, 4/10/2016, 5/3/2016, 6/21/2016), 142 (telephone conversation memorialized by Ashlea Mellinger, 6/2/2015), 161 (summary created by Kauffman-Jacoby), 162-64 (family service and child permanency plans signed by Kauffman-Jacoby, 5/20/2016). Most of the exhibits were not authored by Kauffman-Jacoby and all contained additional hearsay.

[12] *See, e.g.,* Exhibits 7 (ODI in-home casework services reports from 10/8/2013-10/12/2013), 8 (same from 10/22/2013-11/19/2013), 15 (same from 11/27/2013-1/14/2014), 36 (same from 7/21/2014-10/21/2014), 105-06 (same from 10/22/2014-1/22/2015 and 1/23/2015-4/4/2015, respectively), 108-09 (ODI quarterly visitation reports for Mother and Children from 2/22/2014-5/22/2015 and 5/23/2015-8/23/2015, respectively), 165-166 (series of resource parent monthly reports from 2/1/2016-5/31/2016).

[13] *See, e.g.,* Exhibits 63 (series of reports from Pennsylvania Counseling Services authored by either Jorge Acevedo or Gregg Hummel, from 5/1/2014-10/31/2014), 65 (nearly 200 pages of ODI in-home casework services reports authored by either Samantha Rechieru or Emmanuel Vazquez, from 2/11/2014-8/9/2014), 110 (series of ODI visitation reports for Mother and Children authored by either Robyn Battle, Ana Sulivera or Staci Kachel, from 9/26/2015-2/3/2016).

[14] *See, e.g.,* Exhibits 56 (urine collection results for Mother, 8/18/2014-9/16/2014), 64, 154 (same for Father, 2/11/2017-8/9/2014 and 4/1/2015-1/6/2016, respectively), 120-121 (same, for Mother and Father, 12/5/2014-3/23/2015), 127 (a five-page typed summary of Father's criminal history from 1987-2014) 157-158 (drawings by A.J.R.-H. with additional writing from an unlisted source/agency), 160 (same, for I.G.H.-R.).

[15] *See, e.g.,* Exhibits 33 (email sent 6/26/2014 by Samantha Rechieru of ODI to Cecily Pachuilo of CYS), 55 (email sent by 11/5/2014 Samantha Rechieru of ODI to Kimberly Reinert of CYS), 69-70 (emails sent 11/5/2014 and 11/11/2014, respectively, by Gerald Menaquale of CCG to a employees of CCG and Kimberly Reinert of CYS), 107 (ODI

dockets and court orders, none of which were certified copies.[16] Neither Kauffman-Jacoby nor any other witness testified to being the custodian of any of the records admitted from the various sources and authors. No witness stated that she was able to speak to the mode of each of the documents' preparation, testify that the documents were created at or near the time of the documented event or conversation, or made in the regular practice of the activity involved. In fact, several of the documents were ineligible for admission under the business records exception at all, as they contained statements of diagnosis and/or opinion, thus requiring the scrivener to testify.[17] *See Williams v.*

---

quarterly visitation report for Mother and Children from 11/24/2014-2/21/2015, authored by Avion Onyeka and documenting some visits that were supervised by Dennisse Ayala), 111 (same, from 2/26/2016-5/26/2016, authored by Rachel Leonardziak and documenting some visits that were supervised by Staci Kachel), 138 (series of emails sent 4/23/2016-4/26/2016 between Rachel Leonardziak of ODI and Kauffman-Jacoby), 146 (series of emails sent 1/18/2016-1/19/2016, between Julie Karaisz and Gerald Menaquale of CCG and Ashlea Mellinger of CYS).

[16] *See, e.g.,* Exhibits 6 (temporary PFA order, 10/11/2013), 9 (order dismissing PFA, 12/27/2013), 21-22 (juvenile court orders in dependency case, 2/21/2014, rescheduling hearing and ordering parents' compliance), 26-31 (same, 4/3/2014, 6/10/2014, and 6/11/2014, respectively, addressing CYS request for removal of Children), 34-35 (same, 8/13/2014, regarding unsupervised contact between Father and Children), 42-43 (same, 10/14/2014, giving Father permission to return home), 71-72 (same, 11/17/2014, removing Children), 73-74 (same, 2/11/2015, reducing Mother's visitation rights), 75-76 (same, 5/5/2015, permanency review orders), 87-88 (same, 2/19/2016, permanency review orders), 90-94, 101-102 (printouts of criminal dockets regarding Mother), 95-96, 98-100 (printouts of traffic court dockets regarding Mother), 97 (printout of civil docket regarding Mother from 2013), 103 (summary of Mother's appearances in Magisterial District Court 23-1-05, 2004-2014), 104 (Lancaster County Court of Common Pleas court summary regarding Mother, including withdrawn, dismissed and nol prossed charges, from 2004-2016) 123 (PFA violation notice, warrant for indirect criminal contempt, and sentencing order for Father from June 1990), 128 (a 110-page printout of criminal, miscellaneous and traffic dockets regarding Father dating back to 1987).

[17] *See, e.g.,* Exhibits 112 (domestic violence evaluation for Mother by Kristen Hunzinger from ODI, 11/24/2015), 119 (monthly reports on Mother's treatment through Pennsylvania Counseling Services by various therapists, 11/2015-3/2016), 167-168 (reports from Cherrie Sage, M.A., Children's mobile therapist).

*McClain*, 520 A.2d 1374, 1376-77 (Pa. 1987) (records containing opinion evidence or statements of diagnoses are inadmissible under the business records exception); Pa.R.E. 803(6), Comment. *See also In re Involuntary Termination of Parental Rights (Jones)*, 297 A.2d 117, 121 (Pa. 1972) (*"Jones"*) (holding that the admission of a written statement prepared by a non-testifying physician regarding the mother's parental incapacity at a termination hearing was inadmissible hearsay and that the business records exception was inapplicable).

Furthermore, a large number of the exhibits contained multiple levels of hearsay. Where a hearsay document contains additional hearsay within it (often referred to as "double hearsay"), each level of hearsay must satisfy an exception to the rule prohibiting the admission of hearsay evidence. *Commonwealth v. Ogrod*, 839 A.2d 294, 327 n.23 (Pa. 2003) ("Double hearsay is permissible if there is a hearsay exception for each statement in the chain."); Pa.R.E. 805. There was no testimony providing a basis for the admission of each level of hearsay contained within the individual documents. Further, even if CYS could overcome the hearsay barriers, no witnesses provided testimony that would authenticate the majority of the exhibits.[18] *See* Pa.R.E. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims

_____

[18] The only exceptions are Exhibits 140, 155, 156 and 159. Exhibit 140 was a series of cards and letters authored by Father and sent to the Children and their caregiver, and Father authenticated them during his testimony. *See* N.T., 8/12/2016, at 140. Karlunas authored and authenticated Exhibits 155, 156 and 159 during her testimony. *See id.* at 31-33, 42-44. Karlunas did nothing more than authenticate them, and provided no testimony that would otherwise support their admissibility.

it is."); *Commonwealth v. Zook*, 615 A.2d 1, 10 (Pa. 1992) ("Generally, for a document to be admissible it must be relevant and authenticated.").

CYS's contention that Exhibit 161 was properly admitted because Kauffman-Jacoby was its author and available for cross-examination is legally unsupportable. Exhibit 161 is a seventy-three-page document that contains (1) several summaries of the case and the parties involved, obtained from unknown sources; (2) summaries of activities conducted by other caseworkers previously assigned to work with the family (with no corresponding documentation); and (3) a description of each of the exhibits entered into evidence at the termination hearing (as well as Exhibit 124, which the orphans' court excluded) and a summary of many of them from Kauffman-Jacoby's viewpoint. *See* Exhibit 161. It is comprised almost exclusively of additional hearsay statements (some with multiple levels of hearsay), for which no exception to the prohibition against hearsay was offered before the orphans' court.

Indeed, we have long recognized that summaries of this nature are not admissible at termination proceedings. In *Jones*, the county agency entered a document into evidence setting forth the family's history with the child welfare agency that was created by a testifying caseworker, but which summarized information that had been accumulated by others. *Jones*, 297 A.2d at 120. As in the case at bar, the caseworker that authored the report was present and available for cross-examination, but we held that this was insufficient to render the report admissible. "The report escaped the test of cross-examination with respect to the 'facts' which underpin its conclusions, a test designed to probe sources of error and untrustworthiness lying beneath the untested assertions of the absent witnesses." *Id.* We found that "the 'business records' exception, though it may

be factually applicable," could not be applied to the summary because of the absence of "evidence of the sources of information and the time and manner of preparation." *Id.* at 121.

As in *Jones*, while it is possible that some of the exhibits **could** have qualified as business records, CYS failed to present any testimony to establish that any of the 167 exhibits, or the numerous separate documents contained therein, satisfied any of the prerequisites for admission under Rule 803(6). We therefore conclude that the orphans' court abused its discretion by admitting the exhibits into evidence.

## IV. Harmless Error and Right for Any Reason

We further find, based on our assessment of the record and the written opinion provided by the orphans' court, that this error was not harmless. In the context of a termination proceeding, we have held that where, in light of the record as a whole, an erroneous evidentiary ruling could potentially have affected the decision to terminate a parent's rights to his or her child, an error is not harmless and the parent is entitled to a new hearing and decision.[19] *In re Sanders Children*, 312 A.2d at 417. We arrived at this

---

[19] The Superior Court erroneously set forth the test for harmless error applicable to criminal matters. *See supra*, p. 12; *see also Commonwealth v. Story*, 383 A.2d 155, 162-68 (Pa. 1978) (establishing the standard of proof and bases for determining whether a non-constitutional error in a criminal prosecution is harmless). We note, however, that to the extent the criminal standard for harmlessness could have applied to this case, the Superior Court also improperly placed the burden on Mother to prove that she was harmed by the erroneous admission of the exhibits. *See Commonwealth v. Fulton*, 179 A.3d 475, 493 (Pa. 2018) (stating that the proponent of the evidence has the burden of proving that the erroneous admission was harmless beyond a reasonable doubt). Nonetheless, as our procedural rules permit a court "at every stage of any action or proceeding" to assess whether an error was harmless, we apply the correct test in our review. Pa.O.C.R. 1.2(a).

Justice Baer, in concurrence, contends that the *In re Sanders Children* Court did not articulate a standard for determining whether the erroneous admission of evidence in a

standard "[b]ecause of the serious impact attending the termination of parental rights," finding that "it is important that a judicial decree extinguishing such rights be based solely on competent evidence." *Id.*

In its written opinion, the orphans' court included no citations to the record to indicate what sources of information it relied on in making its findings of fact. However, it did make several general references to its review and reliance upon the exhibits entered at the termination hearing. *See* Orphans' Court Opinion, 10/25/2016 at 1 (reaching its decision from its review of the testimony and exhibits), 7 (basing its conclusion on "the entire record"). These references alone provide a basis for this Court to conclude that

termination of parental rights case was harmless. Concurring Op. (Baer, J.) at 2. While that opinion does not use the terminology "harmless error," the holding cannot be read as anything other than the standard by which to measure the impact of erroneously admitted evidence on the outcome of the case.

> While the contested evidence discussed above constituted only a minor part of [the agency's] case, we cannot say that without this evidence the lower court would have reached the same result. Because of the serious impact attending the termination of parental rights, it is important that a judicial decree extinguishing such rights be based solely on competent evidence. In light of [the parents'] significant evidence of self-improvement, it is quite possible that the incompetent evidence accepted below provided the 'swing factor' in that court's determination. [Parents] are entitled to a hearing and decision free from such taint. Hence, we will remand this matter to the court below for the purpose of conducting a proceeding consistent with this opinion.

*In re Sanders Children*, 312 A.2d at 417.

Given that neither the Superior Court nor the parties even recognize this binding precedent, let alone articulate a rationale for overruling it, there is no basis for us to do so here. Such a sua sponte abrogation of precedent is particularly inappropriate in this case where the adoption of a different standard would not be outcome determinative. By any standard, including the one espoused by Justice Baer, the erroneously admitted evidence dwarfs all other evidence in the case before us and thus reversal is required.

the decision reached by the orphans' court to terminate Mother's parental rights to her Children could very well have been affected by the improperly admitted exhibits, requiring us to vacate its decision and remand the matter for a new hearing. *See In re Sanders Children*, 312 A.2d at 417. Because the orphans' court, by its own express acknowledgement, relied on the inadmissible exhibits, we cannot permit its decision to form the basis for the termination of Mother's parental rights.

But we need not base our decision on these general references alone, as our studied review of the record reveals that in reaching its decision, the orphans' court relied upon information presented solely through the exhibits:

- It recounted the substance of the initial referrals made to CYS about the family beginning in 2007 and the particulars of the investigation performed by prior CYS caseworkers. Orphans' Court Opinion, 10/25/2016, at 5; Exhibits 1-3, 161.

- The court included the specific allegations made in Mother's PFA petition (as well as noting Mother's failure to appear in court to finalize the PFA) and portions of Father's criminal history. Orphans' Court Opinion, 10/25/2016, at 5 & n.3; Exhibits 6, 127-128, 161.

- It detailed the content of (and correct date of filing for) the 2013 dependency petitions. Orphans' Court Opinion, 10/25/2016, at 5-6; Exhibits 10-11.

- It described the content of numerous court orders issued by the juvenile court, including the specific findings reached regarding Mother's compliance with her court ordered goals. Orphans' Court Opinion, 10/25/2016, at 6-7; Exhibits 16-17, 21-22, 26-29, 34-35, 42-43, 71-88, 161.

- The orphans' court found that Mother failed to comply with counseling and mental health services, but documentation of Mother's level of compliance with counseling and mental health services following the Children's removal from her care came from reports provided by non-testifying third-party agencies and providers. Orphans' Court Opinion, 10/25/2016, at 9; Exhibits 114-119.

- The court found that Mother did not consistently attend the court ordered drug screens, information that was documented in unidentified, unlabeled and unsigned urinalysis reports, the author(s) of which did not testify. Orphans' Court Opinion, 10/25/2016, at 9; Exhibits 12, 18, 25, 56, 120-121.

- It found that Mother "had a less than perfect attendance record" for casework sessions and visitation with the Children, both of which, again, were documented solely through reports authored by various caseworkers from ODI, none of whom testified. Orphans' Court Opinion, 10/25/2016, at 9; Exhibits 7-8, 15, 23, 39, 54, 65, 105-111.

While Kauffman-Jacoby touched upon some (but not all) of this information during her testimony, this does not render the evidence competent or admissible. In *Jones*, we held that an agency caseworker could not testify to the substance of otherwise inadmissible documentary evidence. The two caseworkers in *Jones* testified that their knowledge regarding the family's history with the child welfare agency was "secondhand," based on their review of information accumulated by others, as "neither was personally involved in this matter until after the children were taken from their mother." *Jones*, 297 A.2d at 120 & n.3. On that basis, we found the caseworkers to be "patently incompetent to testify as to the continuous and irremedial nature of [the mother's] parental incapacity." *Id.*

In *In re Sanders Children*, we held that absent compliance with the prerequisites of the business records exception, a testifying caseworker could not rely on reports contained in the CYS file to support her testimony. In that case, the testifying caseworker "mentioned a report of child neglect ... which was handled by two other employees of the [agency]" while providing testimony regarding the child welfare agency's history with the family. *In re Sanders Children*, 312 A.2d at 416. The parents objected to her testimony about this report, and the agency responded that the caseworker was "only testifying from her records." *Id.* The orphans' court allowed the testimony and ultimately terminated the parents' rights to their children.

On appeal to this Court, we vacated the decree, finding the above-referenced testimony to be "classic hearsay." *Id.* "The witness' first-hand knowledge of some of the

facts contained in the report cannot justify the admission of otherwise incompetent hearsay testimony drawn from the same report." *Id.* Although we acknowledged that the agency may have been able to overcome the hearsay objection by complying with the business records exception, "it failed to do so," rendering the evidence inadmissible. *Id.* at 416-17.

As in *Jones* and *In re Sanders Children*, Kauffman-Jacoby in the case at bar admitted that the majority of her testimony was not based on her firsthand knowledge about the family, and instead that she relied on reports from prior CYS caseworkers and third-party service providers. It could not have been otherwise, as Kauffman-Jacoby only assumed responsibility for the case in February 2016, around the time that CYS filed the petitions to terminate Mother's parental rights to the Children. *See* N.T., 8/12/2016, at 115. Throughout her testimony, Kauffman-Jacoby regularly had to refer to the exhibits (in particular, Exhibit 161) to provide answers to questions posed to her regarding the history of CYS's involvement with the family and the parties' compliance with the court ordered services. *See, e.g., id.* at 84, 107, 113, 115. No other witness provided any testimony in support of the above-findings made by the orphans' court in support of termination.

The orphans' court relied on all of this information to support its decision that CYS had satisfied its burden of proof under section 2511(a) of the termination statute.[20] It

---

[20] The orphans' court did not specify under which subsections of 2511(a) it was terminating Mother's parental rights to Children. In its decree, the court simply found that CYS has established "the facts alleged" in its petition to terminate Mother's parental rights by clear and convincing evidence. Final Decree, 8/25/2016. As stated hereinabove, CYS filed its petition under 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8). A close reading of the language used in the orphans' court's Rule 1925(a) opinion, in conjunction with the decree, suggests that it terminated Mother's rights under all subsections alleged by CYS.

concluded that Mother had failed to perform her parental duties, failed to remedy the conditions that led to the Children's removal from her care more than a year prior, and failed to avail herself of the various services provided to her such that the continuation of services would not likely effect a change in her insight or in her behaviors. Orphans' Court Opinion, 10/25/2016, at 9.

It further found that CYS had met its burden of proving that termination of Mothers' rights best served the Children's needs and welfare under 2511(b).[21] Specifically, the court found that the Children felt safe and had a positive bond with their foster parents, but felt unsafe and, "to the extent a bond exists between the Children and Mother ..., it is an unhealthy one at best." *Id.* at 10. It concluded that the Children had "suffered significant trauma caused by Mother and Father," and that they "deserve an opportunity to experience a trauma-free life in a permanent, healthy, safe home where their rights to the fulfillment of their potential can be met." *Id.*

Our review of the record reveals that although there was some testimony provided by Radcliffe that the Children told her they wished to remain with their maternal grandparents and did not feel safe living in their old home with Mother, *see* N.T., 8/12/2016, at 129, this testimony followed and was bolstered by testimony regarding erroneously admitted exhibits. *See id.* at 124-27. In particular, both Kauffman-Jacoby and Radcliffe testified regarding drawings completed by the Children with a non-testifying Child Prep worker. In one set of drawings completed with the prior Child Prep worker,

---

[21] A "needs and welfare" analysis under 2511(b) includes considering "[i]ntangibles such as love, comfort, security, and stability," as well as "the emotional bonds between the parent and child," with "[t]he utmost attention ... paid to discerning the effect on the child of permanently severing the parental bond." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

the Children were reportedly asked to identify a "safe house" and an "unsafe house." *Id.* at 118, 126; *see* Exhibits 158, 160. One of the Children – Radcliffe "believe[d]" it was A.J.H.-R. – wrote her parents' address on the picture depicting the unsafe house. N.T., 8/12/2016, at 126; Exhibit 158. Though Radcliffe testified that this activity was "very typical in Child Prep," and she provided information as to how the exercise "typically" proceeded, she was incapable of giving any information about what specifically occurred while the Children completed this task, what, if any, questions were posed to or by the Children during the activity, what, if any, information was provided to the Children by the Child Prep worker, or what the drawings necessarily depicted. *See* N.T., 8/12/2016, at 125-27.

There was also a fourteen-page series of writings and drawings entered into evidence, some of which included A.J.H.-R.'s name, others of which provided no identifying information as to who created the document. *See* Exhibit 157. The documents detailed episodes of domestic violence, drug use, and other events labeled by an unknown person as "trauma." *Id.* The exhibit included a number of fears that the child involved in the activity reportedly expressed, including worries she had about Mother, Father, domestic violence, drug use, Mother's friends, the family's finances, and the like. The writings and drawings appear to have been completed in response to questions posed, but the specifics of it are not apparent from the record. *See id.* There was no testimony provided to explain or give context to the exhibit. The only information provided about Exhibit 157 was from Kauffman-Jacoby, who stated that the exhibit "came from the mobile therapist at [CCG]," but that individual did not testify. N.T., 8/12/2016, at 88. While there was some competent testimony provided by Karlunas and Kauffman-Jacoby that

the Children had been exposed to trauma while in their parents' care, no testimony came close to the detail that the lists and drawings in Exhibits 157, 158 and 160 provided.

The testimony not based on the inadmissible exhibits in support of termination under section 2511(b) was scant. Kauffman-Jacoby termed the Children's bond with Mother as "protective," but she admitted that she based this belief on reports from other service providers, as she had only ever seen the Children interact with Mother before and after dependency hearings. *Id.* at 90-91. There was no testimony that the bond was "unhealthy," as the orphans' court concluded,[22] nor was there any testimony regarding what, if any, effect severing the bond with Mother would have on the Children. In fact, Karlunas testified at the termination hearing that both Children told her that they are very close to Mother. Karlunas further testified that Mother expressed to her that she loves the Children and wants to keep them safe. *Id.* at 48, 56, 59-60, 64.

Based on the record before us, we simply cannot conclude that the erroneous admission of the exhibits played no role in the orphans' court's decision to terminate Mother's parental rights. Quite to the contrary, the inadmissible exhibits provided the foundation for the orphans' court to find clear and convincing evidence in support of termination under subsections (a) and (b) of the termination statute. We reiterate that while it is possible that some of the improperly admitted documents, including those supporting the testimony of Kauffman-Jacoby and Radcliffe, may have qualified as business records under Rule 803(6), CYS did not introduce the testimony necessary to

---

[22] The record reflects that the county solicitor asked Kauffman-Jacoby whether she believed the bond between Mother and the Children was "unhealthy," but the orphans' court sustained an objection to the question and did not allow the Kauffman-Jacoby to answer the question. N.T., 8/12/2016, at 119.

satisfy the prerequisites for admission of these documents under the rule, including that of a records custodian. *See In re Sanders Children*, 312 A.2d at 416-17. CYS further presented no testimony that would allow the admission of the multiple levels of hearsay upon which the aforementioned testimony relied.

Notably, in *In re Sanders Children*, "the contested evidence ... constituted only a minor part of [the agency's] case," consisting of testimony regarding a single hearsay document, but this Court nonetheless vacated the decree because of the mere possibility that the evidence could have impacted the decision of the orphans' court. *Id.* at 417. In the present matter, the contested evidence was unquestionably a much greater part of CYS's case in support of its petition to terminate Mother's parental rights to the Children, consisting of over 1230 pages of material in 167 exhibits that furnished a great deal of information to the orphans' court in support of termination. Moreover, in the case at bar, as demonstrated hereinabove, the orphans' court plainly relied on the hearsay exhibits in support of its termination decree. Because the erroneous evidentiary ruling affected the orphans' court's decision to terminate Mother's parental rights to the Children, and the decrees were not based solely on competent evidence, the error of admitting the 167 exhibits was not harmless and we must remand the case for a new hearing on CYS's petition to terminate Mother's parental rights to the Children. *See In re Sanders Children,* 312 A.2d at 417.

The Superior Court did not conduct a harmless error analysis, nor did it explain the basis for finding harmlessness other than its bald statement that the evidence presented was "sufficient" to support termination. *See In re A.J.H. and I.G.H.*, 2017 WL 1573229, at *9. Contrary to the Superior Court's conclusion, however, the fact that there may have

been sufficient evidence presented at the hearing to support termination is not, alone, a basis for finding harmless error.[23] As stated above, the standard for finding harmlessness in a termination case requires us to conclude that the evidentiary error could not have had any impact upon the orphans' court's decision. *See supra*, p. 22. That there may have been properly admitted evidence sufficient to support termination does not render the orphans' court's substantial evidentiary error harmless.

Though couching its decision in terms of harmless error, it appears that the Superior Court may have instead been invoking the "right for any reason" doctrine to affirm the orphans' court's decision.[24] The "right for any reason" doctrine allows an appellate court to affirm the trial court's decision on any basis that is supported by the record. *See Ario v. Ingram Micro, Inc.*, 965 A.2d 1194, 1200 (Pa. 2009) ("an appellate court may uphold an order of a lower court for any valid reason appearing from the record"). Under the circumstances of this case, however, that doctrine is inapplicable.

---

[23] This is true as well for the criminal standard for evaluating harmless error, upon which the Superior Court relied. *See, e.g., Commonwealth v. Bullock*, 913 A.2d 207, 217-18 (Pa. 2006) ("Evidentiary sufficiency, however, is not the correct standard where the trial court errs. Rather, under the harmless error doctrine, the judgment of sentence will be affirmed in spite of the error only where the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict.").

[24] We observe that in affirming the orphans' court's decree terminating Mother's parental rights, the Superior Court also relied, in part, on the inadmissible exhibits to find that CYS satisfied its burden of proof. In concluding that the evidence supported termination under section 2511(a)(2), the Superior Court pointed to evidence that Mother failed to follow recommendations following her discharge from Gaudenzia; was unsuccessfully discharged from mental health counseling; failed to attend urine screens; twice failed to complete domestic violence therapy; continued to have a relationship with Father; and failed to comprehend the impact that domestic violence had on the Children. *In re A.J.H. and I.G.H.*, 2017 WL 1573229, at *6.

The rationale behind the "right for any reason" doctrine is that appellate review is of "the judgment or order before the appellate court, rather than any particular reasoning or rationale employed by the lower tribunal." *Id.* (citing *Hader v. Coplay Cement Mfg. Co.*, 189 A.2d 271, 274-75 (Pa. 1963)). As the United States Supreme Court has explained, "The reason for this rule is obvious. It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate." *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88 (1943) (citing *Helvering v. Gowran*, 302 U.S. 238, 245 (1937)).

This Court has stated that an appellate court may apply the right for any reason doctrine "where the correct basis for the ruling, order, decision, judgment or decree is clear upon the record." *Bearoff v. Bearoff Bros., Inc.*, 327 A.2d 72, 76 (Pa. 1974). However, "where disputed facts must be resolved[,] appellate courts should refrain from assuming the role of a fact-finder in an attempt to sustain the action of the court below." *Id. See also Chenery Corp.*, 318 U.S. at 88 ("where the correctness of the lower court's decision depends upon a determination of fact which only a jury could make but which has not been made, the appellate court cannot take the place of the jury"). The doctrine thus may be applied by a reviewing court if the established facts support a legal conclusion producing the same outcome. It may not be used to affirm a decision when the appellate court must weigh evidence and engage in fact finding or make credibility determinations to reach a legal conclusion.

As our discussion of the orphans' court's opinion reveals, many of its findings of fact were heavily premised on the inadmissible exhibits. Kauffman-Jacoby was the only

CYS witness to testify regarding Mother's failure to remedy the conditions that led to the Children's removal and, as stated hereinabove, her testimony was based almost exclusively on the inadmissible exhibits.[25] Moreover, in their testimony, Mother and Father challenged or disputed much of the evidence presented by CYS regarding Mother's failings.

Based entirely on the inadmissible records, Kauffman-Jacoby testified that Mother failed to complete her drug and mental health treatment goals. She acknowledged that Mother completed a six-month inpatient drug treatment program at Gaudenzia, but that she then failed to attend aftercare treatment in Lancaster (as recommended by her treatment team), and then was unsuccessfully discharged from the dual diagnosis program at Pennsylvania Counseling Services. N.T., 8/12/2016, at 82. She further testified that Mother failed to comply with urine screens beginning in March 2016 (she otherwise had complied and tested negative following her completion of Gaudenzia in November 2015), attending only two of sixteen scheduled screens, both of which tested negative. *Id.* at 113.

Mother, on the other hand, testified that she had complied with both the drug and alcohol treatment and mental health treatment goals. She stated that she was successfully discharged from Gaudenzia, a dual diagnosis program. *Id.* at 162. She explained that she chose to pursue aftercare treatment in Reading instead of Lancaster because she did not want to remain so far away from the Children (Gaudenzia is located in Ashland) and was concerned that living in a new city and the clientele in the Lancaster

---

[25] Karlunas testified that Mother was unsuccessfully discharged from domestic violence counseling at CCG, but that occurred prior to the Children's removal from Mother's care. N.T., 8/12/2016, at 38, 65.

programs could compromise her recovery. *Id.* at 164. Thereafter, she stated that she completed a three-session-per-week aftercare program with Aaron Smith at Pennsylvania Counseling Services and began working with another counselor for weekly sessions, but because of a change in her work schedule, she could not reliably make it to counseling on time, which resulted in her discharge. *Id.* at 165.

Mother testified that following her successful discharge from Gaudenzia, she temporary obtained employment, typically working until 4:30 p.m., and this allowed her to attend counseling and urine screens. *Id.* at 167. In March 2016, however, she received a new, permanent position within the company, and her work schedule changed to 6:00 a.m. until 6:00 p.m. *Id.* at 167-68. She relied on the bus for transportation, which did not get her to the bus station until around 7:00 p.m. *Id.* at 167. She testified that the facility CYS used for urinalysis closed at 6:00 p.m. She stated that she offered to go elsewhere or to attend screens on her days off, but Kauffman-Jacoby told her it would not suffice, as the screens would not be "random," and instead told her it was not necessary for her to continue attending urine screens. *Id.* at 168-69. Mother admitted that her drug of choice in the past was K2 (synthetic marijuana), but testified that she has been drug-free for sixteen months. *Id.*

Regarding the domestic violence between the parties, Kauffman-Jacoby testified, again based on the hearsay exhibits, that it was an ongoing concern based on both Mother and Father's failure to make progress. *Id.* at 85. Father was reportedly unsuccessfully discharged from CCG because of his lack of progress, and although he successfully completed the dual diagnosis program through Pennsylvania Counseling Services, there were reported concerns about his inability to translate his treatment to

"real life situations." *Id.* at 83. Kauffman-Jacoby further testified that in a conversation she had with Father, he did not take responsibility for his actions, blaming Mother's drug use for his violence. *Id.* at 86. Without providing a basis, in fact or experience, for her opinion, Kauffman-Jacoby stated, "There's a high likelihood the cycle will repeat and ongoing domestic violence will be possible and will affect the children." *Id.* at 85.

Father, however, testified that he successfully completed domestic violence counseling through ODI. *Id.* at 135. He expressed to the orphans' court that he understood, based on the services he had received, how his actions hurt Mother and the Children and learned new methods to control his anger. *Id.* He stated that he participated in further counseling through CCG for eight months, and that he was not informed that he was going to be discharged unsuccessfully. *Id.* at 137. Thereafter, he engaged a private therapist for counseling. *Id.* at 137-38. Father stated that alcohol was a trigger for his violence, and that he has been sober since October 2014. *Id.* at 139. He testified that he knew his actions hurt his Children, and he sent them cards following their removal from his home, asking for their forgiveness. *Id.* at 139-40.

Both Mother and Father testified that there have been no incidents of domestic violence since the Children's removal from their care. *Id.* at 150, 173. Mother testified that she recognized their history of domestic violence, but stated, "Everybody makes mistakes and things. Everyone did things in their life that they regret, you know. You move forward and you know you forgive and forget. You try to move on and better yourself." *Id.* at 170-71. Mother admitted that she continued to maintain a friendship with Father, and that their relationship was "at times" of a sexual nature. *Id.* She testified, however, that she does not live with Father anymore and has a place of her own. Though

it is small and not "ideal," Mother testified that it is clean and "really no place can be ideal." *Id.* at 169-70. Kauffman-Jacoby acknowledged that Mother reported that she had moved out, but stated that she has not seen Mother's new residence "[b]ecause we have been focusing on permanency for the children," and based on the size of Mother's apartment alone, Kauffman-Jacoby concluded that "it won't be appropriate for two young children." *Id.* at 80.

Kauffman-Jacoby expressed no concerns about Mother's attendance at visits or her behavior there, testifying that Mother was reportedly appropriate and loving with the Children and they were happy to be with her, running to hug and kiss her when they saw her. *Id.* at 108-09. She confirmed that Mother successfully completed parenting classes. *Id.* at 105. She further testified that A.J.R.-H. had asked her "for more time with her parents during visits because it was fun." *Id.* at 117.

As we stated in *In re Sanders Children*, where, as here, there is conflicting testimony regarding a parent's compliance with court ordered goals, the erroneously admitted evidence could have affected the credibility determinations made by the orphans' court and ultimately served as the tipping point or "swing factor" in its decision. *In re Sanders Children*, 312 A.2d at 417. We are unable to discern whether and to what extent the content of the exhibits influenced the credibility determinations made by the orphans' court. In fact, in the absence of the offending exhibits, if the testimony presented by Mother and Father were believed by the orphans' court, there would be no basis to

find that CYS had satisfied its burden to terminate Mother's parental rights to the Children, as she would have been compliant with all of her court ordered goals.[26]

Therefore, in order to affirm its decision on another basis (i.e., based on testimony that was untainted by the erroneous admission of the exhibits), we would have to engage in fact finding, weigh the competent (non-hearsay) testimony presented, and make our own credibility determinations. As this is far afield of our appellate court function, we cannot affirm under the right for any reason doctrine.

## V. Conclusion

We recognize the highly sensitive nature of a termination proceeding and the importance of permanency for children in foster care. We also recognize, however, that "the right to make decisions concerning the care, custody, and control of one's children is one of the oldest fundamental rights protected by the Due Process Clause." *Hiller v. Fausey*, 904 A.2d 875, 885 (Pa. 2006) (*citing Troxel v. Granville*, 530 U.S. 57, 67 (2000)). Involuntary termination serves as "the most extreme infringement" upon this right. *In re D.C.D.*, 105 A.3d 662, 676 (Pa. 2014).

As the United States Supreme Court has long held, due process requires that the county agency present clear and convincing evidence in support of its petition to terminate a parent's rights to his or her child. *Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982). The evidence that clearly and convincingly supports the termination of this fundamental right must necessarily be competent. As the evidence presented in the case at bar was not competent to support the orphans' court's decision to terminate Mother's parental

---

[26] There is nothing in the record indicating that the dependency court prohibited or even discouraged Mother and Father from having contact with each other following the Children's removal from their care.

rights to her Children, we vacate that decision. We remand the case to the orphans' court for a new hearing and decision on CYS's petition to terminate Mother's parental rights, to occur within 45 days of this decision.[27]

Chief Justice Saylor and Justices Todd, Dougherty and Wecht join the opinion.

Justice Baer files a concurring opinion.

Justice Mundy files a concurring opinion in which Justice Dougherty joins.

Judgment Entered
07/18/2018

*Amy J. Dreibelbis*

Deputy Prothonotary

---

[27] Under the circumstances of the case and the expedited timeframe for the new hearing and decision, CYS need not undertake reunification efforts in this interim. We note that on remand, the appointment of counsel to represent the Children's legal interests will be controlled by *In re L.B.M.*, 161 A.3d 172 (Pa. 2017).