J-A16028-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: I.G.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.J.R., MOTHER | |
| | No. 61 MDA 2019 |

Appeal from the Decree Entered August 24, 2018
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
84696

| | |
|---|---|
| IN RE: A.J.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.J.R., MOTHER | |
| | No. 62 MDA 2019 |

Appeal from the Decree Entered August 24, 2018
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
84695

BEFORE:   LAZARUS, J., MURRAY, J., and STEVENS*, P.J.E.

MEMORANDUM BY MURRAY, J.:                **FILED: JULY 10, 2019**

K.J.R. (Mother) appeals from the decrees involuntarily terminating her parental rights to her minor children, A.J.R. (born March 2007) and I.G.R.

_____
* Former Justice specially assigned to the Superior Court.

(born July 2010) (collectively, Children), pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1]  After careful review, we affirm.

On February 21, 2013, Berks County Children and Youth Services (CYS) received a report that Mother was smoking marijuana on a daily basis, suffered from mental health issues, and was not appropriately supervising and feeding Children; CYS also learned that Father had been incarcerated on domestic violence charges.  *See* N.T., 8/13/18, at Ex. 1-2.  Following a more thorough investigation, which revealed a lengthy history of domestic violence and abuse in the family, CYS caseworkers filed dependency petitions as to Children on December 31, 2013.  *Id.*

On April 3, 2014, the court adjudicated Children dependent, although Children remained in the physical custody of Mother.  *See* N.T., 8/13/18, at Ex. 5-6.  In November 2014, Children were removed from Mother's custody following concerns regarding her drug use, and placed in kinship foster care with Maternal Grandmother and her husband (Maternal Grandparents).  *Id.* at Ex. 15-18.  Permanency review hearings were held in August 2014, May 2015, and February 2016; Mother made moderate progress in her goals, but minimal progress in addressing the issues leading to Children's placement. *Id.* at Ex. 11-12, 23-24.

---

[1] The parental rights of D.W.H. (Father) were terminated in August 2016. Father appealed the termination to this Court, and we affirmed.  Father did not seek allowance of appeal with the Pennsylvania Supreme Court.

On February 19, 2016, CYS filed petitions to terminate Mother's parental rights to Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). The trial court held a hearing on August 12, 2016. Thereafter, the court involuntarily terminated Father's and Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).

Father and Mother appealed, and on May 1, 2017, this Court affirmed the termination of their parental rights. **In re A.J.H.**, 170 A.3d 1182 (Pa. Super. 2017) (unpublished memorandum), *appeal granted*, 169 A.3d 1078 (Pa. 2017), and *vacated sub nom*. **In re A.J.R.-H.**, 188 A.3d 1157 (Pa. 2018). Mother petitioned for allowance of appeal to the Supreme Court of Pennsylvania, which granted allowance of appeal. **In re A.J.H.**, 169 A.3d 1078 (Pa. 2017).

On July 18, 2018, the Pennsylvania Supreme Court vacated this Court's order affirming the trial court's termination of Mother's parental rights and remanded for a new termination hearing, holding that the record failed to support a finding that exhibits entered into evidence satisfied the business records exception to the prohibition against hearsay; that the trial court thus erred in admitting the records; and this Court incorrectly found that error harmless. **In re A.J.R.-H.**, 188 A.3d 1157, 1159-60 (Pa. 2018).

Prior to the commencement of the termination hearing, Mother filed a motion requesting that the court recuse itself. **See** Motion to Recuse, 8/6/18, at ¶¶ 1-8. Mother argued that because the court had previously terminated her parental rights, the court had already formed a decision that would be

- 3 -

prejudicial to Mother's due process rights under the Pennsylvania and United States Constitutions if the court were to preside over the hearing after remand. *Id.* Additionally, Mother argued that the court had previously heard and considered inadmissible evidence in its prior decision. *Id.* On August 7, 2018, the court denied the motion.

The court convened termination hearings on August 13, 16, and 23, 2018. Cherrie Sage, Children's mobile therapist; Andrea Karlunas, Mother's domestic violence counselor; Ashlea Mellinger, CYS placement caseworker; Marta Smith, Children's trauma counselor; and Nichole Kauffman-Jacoby, adoption caseworker for CYS, testified for CYS. Mother, represented by counsel, was also called to testify by CYS. Children were represented by Molly Sanders, Esquire, as guardian *ad litem*, and John Grenko, Esquire, as legal counsel.[2]

Ms. Sage testified that she is a mobile therapist who treated both Children, but primarily worked with A.J.R. *See* N.T., 8/13/18, at 154. A.J.R.'s treatment goals were to work on expressing her feelings verbally and process the trauma she had experienced while living with Mother. *Id.* Ms. Sage testified regarding writings and drawings A.J.R. made while in counseling. *Id.*

---

[2] Accordingly, Children's statutory right to counsel in a contested involuntary termination proceeding was satisfied. *See*, *e.g., In re Adoption of L.B.M.*, 161 A.3d 172, 180 (Pa. 2017) (plurality). At the conclusion of the hearing, Attorney Grenko indicated that he had met with Children, and that Children's preference was to remain with Maternal Grandparents and are happy in that home. *See* N.T., 8/23/18, at 122-123. Children would like to remain in contact with Mother, but expressed fear about doing so. *Id.* at 123. Children wish to be adopted by their "Nanny and Poppy." *Id.* at 124.

at 154-55. In the writings, A.J.R. discussed Mother's drug use and the domestic violence between her parents, including an incident where Father pointed a gun at Mother; A.J.R. expressed feelings of worry, sorrow, disappointment, and anger. *Id.* at 156-64.

Ms. Sage testified regarding Children's behavioral issues in kinship foster care, and her ultimate recommendation that Children should not be returned to the home of the parents unless the parents demonstrate the ability to understand and accept the effects of trauma upon Children, improve their own mental health, and adequately partner with relevant agencies. *Id.* at 158-59, 164-65. A.J.R. was discharged from therapy in October 2016, and I.G.R. was discharged in November 2016. *Id.* at 172.

Ms. Karlunas testified that her involvement with the family began in January 2014, when she conducted an intake interview of Mother and began individual domestic violence treatment sessions. *See* N.T., 8/16/18, at 7. In the course of her treatment of Mother, Ms. Karlunas prepared several evaluations and reports with clinical recommendations. *Id.* at 8. Ms. Karlunas testified that Mother reported several types of abuse by Father against her, including physical, verbal, psychological, and sexual abuse. *Id.* at 8-9. Mother reported being pushed, choked, punched, threatened with a gun, and slapped; being yelled at, name-called, degraded, and put down; financial abuse; Mother also relayed that she had three abortions at "[Father's] direction." *Id.* However, Mother was uncooperative during treatment and often showed up to sessions under the influence of drugs. *Id.* at 12-13.

Mother minimized and denied behaviors, stating that she did not need treatment, and minimized the effect of the domestic violence on Children. *Id.* at 13-14. At one point, Ms. Karlunas advised Mother that if she did not separate from Father, he may kill her. *Id.* at 20. Mother was discharged unsuccessfully from treatment in December 2014. *Id.* at 10-11.

Ms. Karlunas also conducted domestic violence evaluations of both Children. *Id.* at 11-12. She testified that A.J.R. related several incidents of domestic violence, including Father assaulting Mother while A.J.R. was lying in bed with Mother and threatening Mother with a gun. A.J.R. was hyper-vigilant and worried extensively about Mother. *Id.* at 10-16. A.J.R. showed other signs common of children in domestic violence situations, including taking on a parental role towards her younger sister and Mother, and exhibiting separation anxiety. *Id.* at 15-16. Ms. Karlunas diagnosed A.J.R. with post-traumatic stress disorder (PTSD) and oppositional defiance disorder. *Id.* at 59. I.G.R. presented with more severe anxiety; she clung to Maternal Grandmother and was afraid to let her out of her sight. *Id.* at 16-18. Ms. Karlunas also diagnosed I.G.R. with PTSD. *Id.* at 67-69.

Ms. Mellinger testified that at the beginning of the case, she attempted to get in contact with Mother, who was unreachable by phone. *Id.* at 70-71. When Ms. Mellinger did speak to Mother, Mother indicated that she was going

through withdrawal from K2.[3]  *Id.* at 72.  Ms. Mellinger recommended that Mother enter inpatient drug treatment, and in December 2014, referred Mother to the Berks Treatment Access and Services Center (TASC).  *Id.* at 72-74.  Mother entered treatment at Gaudenzia House from April 2015 through program completion in October 2015.  *Id.* at 72-76.

Following Mother's discharge from Gaudenzia, Ms. Mellinger spoke with Mother regarding further treatment options including halfway houses in Schuylkill County and Lancaster County, although Mother was insistent about returning to Reading. *Id.* at 77.  Ms. Mellinger was unable to find aftercare treatment for Mother in Reading, and Mother was discharged with no aftercare.  *Id.*  Ms. Mellinger and the Gaudenzia team worried that Mother wished to resume her relationship with Father.  *Id.* at 80-81.  In January 2016, Mother indicated to Ms. Mellinger that she had moved back in with Father despite Ms. Mellinger cautioning Mother that the move would make it difficult for Mother to regain custody of Children.  *Id.* at 84-86.

Ms. Mellinger also testified regarding improvements to Children's behavior following their placement with Maternal Grandparents, and their participation in therapeutic services, a set schedule, and other new activities. *Id.* at 87-88.  Children spoke of Mother, but not always in a loving or

_____

[3] K2 is a synthetic cannabinoid.  NATIONAL INSTITUTE ON DRUG ABUSE, https://www.drugabuse.gov/drugs-abuse/synthetic-cannabinoids-k2spice last visited May 29, 2019).

affectionate way. *Id.* at 92. Children never asked to return home to live with Mother or Father, or to see Mother and Father. *Id.* at 106.

Ms. Smith testified that she is the trauma counselor for Children and meets with both Children weekly to address their goals and therapeutic needs for their complex developmental trauma. *See* N.T., 8/23/18, at 7-9, 35-37. Both Children were diagnosed with PTSD and showed symptoms of emotional dysregulation; intrusive thoughts, memories, dreams, and negative thoughts; and distrust of others and the world. *Id.* at 38.

The therapeutic goals for Children were to develop feelings of trust, safety, and security. *Id.* at 11-12. A.J.R. has accomplished those goals and trusts her grandparents, but does not trust her biological parents. *Id.* at 11. I.G.R. has had more difficulty reaching her goals, likely because she was younger when the trauma occurred; I.G.R. is also being treated by a psychiatrist. *Id.* at 12, 16. Children refer to Mother and Father as "biological parents"; A.J.R. has stated that she hates both of her parents for "what they did to her." *Id.* at 11, 31.

Ms. Smith also described A.J.R.'s account of the incident where Father pointed a gun at Mother; A.J.R. stated that she intervened to put I.G.R. in the closet, and stood between Mother and Father in an attempt to protect Mother. *Id.* at 13. When drawing pictures of a "safe" house, Children drew pictures of Maternal Grandparents' home. *Id.* at 23-24. When drawing pictures of an "unsafe house" Children drew pictures of Mother's home. *Id.* A.J.R. wants Maternal Grandparents to adopt her, and I.G.R. wishes to remain with

Maternal Grandparents. *Id.* at 58. Ms. Smith's professional opinion was that Children's best chance for success and healing was to remain in the home with Maternal Grandparents, where they have a positive and affectionate attachment. *Id.* at 31-32, 61. Ms. Smith opined that reunification counseling would be detrimental to Children. *Id.* at 53-54.

Ms. Kauffman-Jacoby testified that she has been assigned to the case since February 2016. *Id.* at 75. At the time she was assigned to the case, Mother was attending supervised visitation, but did not have stable housing or employment, and did not comply with mental health treatment, random urinalysis, or other recommended services. *Id.* at 75-76. Ms. Kauffman-Jacoby did not receive documentation that Mother successfully completed drug and alcohol treatment or domestic violence treatment. *Id.* at 77. Father contacted Mother repeatedly, and Mother was spending weekends with him. *Id.* at 79.

Ms. Kauffman-Jacoby met with Children on a monthly basis for several hours at a time. *Id.* at 79. Children appeared bonded with Maternal Grandparents who, although they struggled at times with parenting and with some marital issues, have been receptive to additional therapy and parenting classes. *Id.* at 79-81. Children and Maternal Grandparents interacted in a loving manner, and Maternal Grandparents met Children's needs, including appropriate discipline. *Id.* at 85.

CYS advocated for adoption by Maternal Grandparents to serve the Children's best interests; CYS recommended that contact with Mother be

limited until approved by Children's trauma therapist. *Id.* at 83. Ms. Kauffman-Jacoby testified that it would not be detrimental to Children if Mother's rights were terminated; rather, it would be detrimental if Children were denied the stability and permanency achieved with Maternal Grandparents over the four years they had been in care. *Id.* at 84-85.

Mother testified to several incidents of domestic violence Father had committed against her, including breaking her nose in October 2011, aiming a gun at her in front of Children in November 2012, and hitting her in the face in November 2012. *See* N.T., 8/13/18, at 45-55. Mother filed a petition seeking a protection from abuse (PFA) order on October 4, 2013; at the termination hearing, Mother claimed that she exaggerated the allegations in the petition. *Id.* at 55-56. After Mother failed to appear at the hearing on the PFA, it was dismissed, and eventually, Mother moved back in with Father. *Id.* at 58-61. Mother testified that she and Father, although no longer in a romantic relationship, "had sexual intercourse on certain occasions" and "remain friends." *Id.* at 71-72, 81-82. Mother testified that she did not feel Father was a risk to Children. *Id.* at 84-85.

Mother admitted that she was addicted to marijuana from the age of thirteen until approximately 2012, when she became addicted to K2. *Id.* at 63. Her addiction became so severe that on September 30, 2014, an ambulance was called due to Mother's irrational behavior. *Id.* at 64-65. Additionally, Mother used drugs around Children, and while driving intoxicated with Children in the car, hit a parked car. *Id.* at 74-75.

Mother completed drug treatment at Gaudenzia, and upon discharge, was to attend an aftercare program. *Id.* at 67. Mother was unsuccessfully discharged from aftercare due to attendance issues, although she claimed that she was unable to make the appointments because of her work schedule and traffic, and stated that she "did the best [she] could." *Id.* at 67-69. Mother admitted that Gaudenzia recommended a step-down program but Mother chose to return to Reading. *Id.* at 70. Mother did not complete agency-requested urinalysis, nor does she attend Narcotics Anonymous or any other kind of meeting. *Id.* at 75, 141. Mother also conceded that she did not successfully complete domestic violence counseling or attend a mental health evaluation. *Id.* at 73, 139. Mother admitted that the last time she asked Maternal Grandmother about Children was in July 2018, and that she did not inquire with her caseworker about Children. *Id.* at 88-89.

Mother is currently employed by a recycling company, where she supervises eighteen other employees. *Id.* at 98-99. She earns $13.00 an hour. *Id.* at 98-100. Mother has been sober for three years. *Id.* at 125.

At the conclusion of the hearings, the court terminated Mother's parental rights. On October 26, 2018, Mother filed a motion requesting that the trial court enforce an Act 101 agreement between the parties or, conversely, grant her the right to appeal the termination of her parental rights *nunc pro tunc*. Following a hearing, the trial court reinstated Mother's appellate rights *nunc pro tunc*.

Mother timely appealed and filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On appeal, Mother raises the following issues for review:

A. Whether the trial court erred as a matter of law, abused its discretion, and violated [Mother's] due process rights under Articles 1 and 11 of the Pennsylvania Constitution and the Fourteenth Amendment of the United States Constitution by failing to recuse itself[?]

B. Whether the trial court erred as a matter of law and abused its discretion by permitting the Berks County Children and Youth Services, over objection, to submit Exhibits 1, 2, 15, 16, 23, 40, and 54 into evidence because the exhibits were submitted for the truth of the matter asserted therein and did not fall under any hearsay exception?

C. Whether the trial court erred as a matter of law and abused its discretion by permitting Berks County Children and Youth Services, over objection, to submit Exhibit 40 because the exhibit was irrelevant and any probative value was outweighed by its unfairly prejudicial impact on the fact finder?

D. Whether the trial court erred as a matter of law and abused its discretion by terminating [Mother's] parental rights where [CYS] failed to prove by clear and convincing evidence the elements of [23 Pa.C.S.A. § 2511(a)(2), (5), and (8)] because evidence submitted at the termination hearing was insufficient to prove the statutory requirements of the sections listed above?

E. Whether the trial court erred as a matter of law and abused its discretion by terminating [Mother's] parental rights in that the evidence at the termination hearing failed to show that the needs and welfare of [Children] are best served by termination?

Mother's Brief at 5 (unnecessary capitalization omitted).

We review cases involving the termination of parental rights according to the following:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

Mother first argues that the trial court violated her due process rights by denying her motion for recusal. *See* Mother's Brief at 24. Mother claims that there was an appearance of impropriety because the court relied on improperly admitted exhibits at the previous termination hearing. *Id.* at 27. Mother contends it was "unreasonable" to believe that the trial court could have separated the information and made a decision solely based on the evidence submitted after remand. *Id.*

A motion for disqualification or recusal is properly directed to and decided by the jurist whose participation is challenged. In disposing of a recusal request, a jurist must first make a conscientious determination of his or her ability to assess the case before the court in an impartial manner, free of personal bias or interest in the outcome. This is a personal and unreviewable decision that only the jurist can make. Once satisfied with that self-examination, the jurist must then consider whether or not continued involvement in the case would tend to undermine public confidence in the judiciary.

*Commonwealth v. Travaglia*, 661 A.2d 352, 370 (Pa. 1995) (citations omitted). With regard to motions for recusal, "it is the burden of the party

requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially . . ." **In re S.H.** , 879 A.2d 802, 808 (Pa. Super. 2005).  As to the appearance of impropriety, "[b]ecause the integrity of the judiciary is compromised by the appearance of impropriety, recusal is necessary where the judge's behavior appears to be biased or prejudicial."  **Commonwealth v. Benchoff**, 700 A.2d 1289, 1295 (Pa. Super. 1997).  Thus, "even if the court determines that there is no actual prejudice, the court must recuse itself if it appears that there is any improper influence."  **Id.**

We have held:

> [i]t is insupportable that an experienced trial judge is incapable of making factual determinations and legal findings in regard to the same child at different hearings, based on separate statutory and philosophic consideration.

**In re Quick**, 559 A.2d 42, 47 (Pa. Super. 1989).  Further,

> [w]here a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overruled on appeal but for an abuse of discretion.  In reviewing a denial of a disqualification motion, we recognize that our judges are honorable, fair and competent.

**S.H.**, 879 A.2d at 808.

Mother argues that significantly negative information "certainly had an impact on the disposition of this case" and "created a reasonable risk of actual bias."  **See** Mother's Brief at 28.  Although she contends that jurists cannot be impartial, as we are to presume, Mother does not support this contention with citation to precedential legal authority.  **Id.** at 28-30.  However, the essence

of Mother's argument is that there is no way the trial court could preside over the proceedings following remand without the appearance of impropriety because the trial court previously terminated her rights.

Despite this broad claim, we have no basis to find that the trial court could not be impartial. There is no discrete allegation of trial court bias other than the fact that the outcome was not in Mother's favor. The trial court was not involved in the dependency proceedings, but presided solely over termination. Further, the record reveals that the court considered proper information on remand, which we discuss *infra*. By denying Mother's motion for recusal, the court indicated that it could preside impartially. In our examination of Mother's argument and the record, we discern no appearance of impropriety. Accordingly, the trial court did not err by denying Mother's recusal motion. *S.H.*, 879 A.2d at 808.

In her second and third issues, Mother argues that the trial court erred as a matter of law and abused its discretion in admitting certain exhibits in violation of the rules against hearsay, and claims that an exhibit was irrelevant and its probative value was outweighed by its prejudicial impact. *See* Mother's Brief at 31, 39.

Absent an abuse of discretion, a reviewing court will not disturb the trial court's rulings on the admission or exclusion of evidence in a proceeding for termination of parental rights. *A.J.R.-H.*, 188 A.3d at 1167. With regard to the admission of evidence:

> the trial court must weigh the relevant and probative value of the evidence against the prejudicial impact of that evidence. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. Although a court may find that evidence is relevant, the court may nevertheless conclude that such evidence is inadmissible on account of its prejudicial impact.

*Commonwealth v. Vucich*, 194 A.3d 1103, 1106 (Pa. Super. 2018), *appeal denied*, 199 A.3d 885 (Pa. 2018). "Hearsay" is "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). "Hearsay is not admissible except as provided by [the Pennsylvania Rules of Evidence], by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802.

Mother first argues that the dependency petitions – Exhibits 1 and 2 – regarding Children, and the permanency review orders – Exhibits 15 and 16 – which removed Children from Mother's custody, should not have been admitted because the persons who authored the exhibits did not testify. *See* Mother's Brief at 33-34. Mother contends that allegations are not evidence, and that although she was willing to stipulate to filing dates and allow the court to take judicial notice of certain facts, the admission itself was "illegal." *Id.* at 34.

This Court has held that evidence from dependency proceedings may be relevant and admissible in termination proceedings. *In re Child M.*, 681 A.2d 793, 799 (Pa. Super. 1996). Here, the trial court explained:

Exhibits One and Two are the allegations of dependency, the petitions, and the docketing entries for both children. A pre-trial hearing was held on August 13, 2018. At this hearing, the [c]ourt held that the exhibits were admitted solely for "the purpose of establishing when the petitions were filed, the dates, who was the petitioner…" and that there were initial allegations filed. However, they were not admitted for the truth of the matters that were asserted in the paragraphs supporting the petition. Therefore, they were admitted for that limited purpose.

Exhibits Fifteen and Sixteen are the petitions that led to the placement of each child. Again, these were admitted for the limited purpose of "showing that these were motions filed with the agency which then resulted in the actual placement of the children."

Trial Court Opinion, 2/5/19, at 13 (citations to the record omitted).

Upon review, we see no error of law or abuse of discretion in the court's conclusion. The petitions and orders from Children's dependency proceedings were admitted for the limited purpose of providing filing dates and initial allegations; thus they were not hearsay. Additionally, numerous witnesses testified to the reasons Children were adjudicated dependent and removed from Mother's custody. Accordingly, there was no error. *A.J.R.-H.*, 188 A.3d at 1167.

Next, Mother argues that Exhibit 23, a May 2015 permanency review order, was improperly admitted due to attached findings of fact prepared by a juvenile court officer. *See* Mother's Brief at 34. The summary report contained the family's history and progress up to the date of the hearing. *Id.* Mother argues that these findings were based upon inadmissible hearsay. *Id.*

The trial court stated:

- 17 -

> Exhibit Twenty-Three is a Permanency Review Order, dated 5/15/2015, concerning A.R.-H. Mother objected to part of this order, specifically the additional findings of fact. Here, the [c]ourt admitted this exhibit as it was a certified copy of the [c]ourt, which Mother did not object to. Therefore, it was admissible.

Trial Court Opinion, 2/5/19, at 13-14 (citations to the record omitted). Here, Mother stipulated to the order's admission as a certified court order. Further, multiple witnesses over the course of the three-day termination hearing testified about the history of the case and Mother's lack of progress. Our review reveals no trial court error. *A.J.R.-H.*, 188 A.3d at 1167.

Next, Mother argues that the court erred in admitting Exhibit 40, which was a United Judicial System of Pennsylvania Web Portal (UJS) printout of her criminal history, which was certified by the Clerk of Court. *See* Mother's Brief at 35. Mother argues that despite this certification, a UJS printout is not self-authenticating. *Id.* Mother asserts that CYS should have provided official Clerk of Court certified sentencing forms. *Id.* at 35-36.

> The trial court, again addressing an evidentiary claim, explained:
>
> Exhibit Forty is a Court of Common Pleas docket regarding Mother. Mother objected as it was not a certified copy of court records. However, Exhibit Forty was certified on August 1, 2018, and the [c]ourt admitted the exhibit. Therefore, it was admissible, as it was a certified copy of Mother's criminal record.

Trial Court Opinion, 2/5/19, at 14 (citation to the record omitted).

We note that pursuant to Pa.R.E. 902(4) and 42 Pa.C.S.A. §§ 6103-6104 (a copy of a record of governmental action or inaction authenticated as provided in section 6103 shall be admissible as evidence that the

governmental action or inaction disclosed therein was in fact taken or omitted), Mother's criminal history was properly certified and admitted.

Further, we find no merit to Mother's claim that Exhibit 40 should not have been admitted because it was irrelevant and more prejudicial than probative. *See* Mother's Brief at 39-40. Mother argues that her drug convictions occurred prior to Children's birth and painted her as a habitual drug user unable to maintain sobriety. *Id.* However, Mother's history of drug abuse was indeed relevant to the case, as her addiction led to the removal of Children from the home, and her failure to properly complete aftercare treatment was a factor in the court's decision to terminate her parental rights. Mother herself testified about her long history of addiction and drug abuse, and therefore, the admission of her criminal history was not more prejudicial than probative. *A.J.R.-H.*, 188 A.3d at 1167.

Mother next objects to the admission of Exhibits 54 and 55, which were the therapist reports created by the Commonwealth Clinical Group. *See* Mother's Brief at 36. Mother argues that the exhibits contained notes from Children, which she asserts were hearsay; Mother further argues that because the therapist did not explain how the notes assisted with treatment, they were improperly admitted for their truthfulness. *Id.*

"Testimony as to what a child tells other people is admissible in order to establish that child's mental state at the time he or she made the comment," particularly for purposes of identifying the child's needs for therapy and treatment. *In re R.K.Y.*, 72 A.3d 669, 677 (Pa. Super. 2013). "[T]estimony

introduced to show a child's state of mind for treatment and therapy purposes is admissible only for that limited purpose and not as substantive evidence of the truth of the matters asserted." *Id*. at 678.

Here, the notes included A.J.R.'s summary of traumas she had focused on in treatment sessions, including domestic violence incidents between Mother and Father and Mother's drug usage. *See* N.T., 8/13/18, at 154-58. Ms. Sage testified that she encouraged A.J.R. to draw and write so that A.J.R. could process the traumas. *Id.* The trial court admitted the exhibits because they were admissible as "expressions [of A.J.R.] as to her concerns and worries that were related in treatment." *Id.* at 162.

The trial court further observed:

> Exhibits Fifty-Four and Fifty-Five are therapist reports from Commonwealth Clinical Group, one for each child. The [c]ourt reserved ruling on these exhibits until the therapist that prepared them testified. Here, Mother did not object to the notes from the children being admitted, but focused specifically on the reports prepared by the mobile therapist. However, the therapist was present, testified, and was cross-examined by Mother. Therefore, the exhibits were properly admitted.

Trial Court Opinion, 2/5/19, at 14. Upon review, we agree that the exhibits were properly admitted. *R.K.Y.*, 72 A.3d at 677.

We now turn to Mother's challenge to the termination of her parental rights. Termination requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his

or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, we focus our analysis on subsections (a)(2) and (b).

The relevant subsections of 23 Pa.C.S.A. § 2511 provide:

**(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

***

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

***

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *See In Interest of Lilley*, 719 A.2d 327, 330 (Pa. Super. 1998). The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *Id.*

Mother argues that the evidence was not clear and convincing in support of termination under Section 2511(a)(2). *See* Mother's Brief at 43. She claims that Children were not physically abused, the home was not unclean, and she did not fail any urinalysis tests or engage in inappropriate visits with Children. *Id.* Mother admitted to instances of domestic violence and drug dependency, but argues that these instances were insufficient to support termination. *Id.* at 43-44.

The trial court succinctly rebutted this argument:

In this case, while Mother has tried to alleviate the concerns that led to the placement of the children, she has been unable to fully do so. Here, Mother is to be commended for completing a six[-]month, in-patient drug treatment. However, Mother left treatment with no aftercare in place, which was against the advice of the treatment provider. Mother failed to complete her counseling after her discharge. Mother began seeing Father again, and stayed with him after she was discharged. Finally,

>   Mother made no progress in her court-ordered services after discharge.  For these reasons, Mother failed to remedy the conditions that led to the placement of her children.  Therefore, termination is warranted under this section.

Trial Court Opinion, 2/5/19, at 8-9 (citation to record omitted).

Again, we discern no error by the trial court.  Mother has not provided evidence of successful completion of domestic violence and mental health treatment, or ongoing drug and alcohol treatment.  Consistent with the record, the trial court acted within its discretion in finding that competent, clear and convincing evidence supported the termination of Mother's parental rights pursuant to Section 2511(a)(2), based upon Mother's continued incapacity – *i.e.*, her inability to complete court-ordered services after discharge and comply with the recommendations of her treatment providers – that resulted in Children being without essential parental care, the cause of which "cannot or will not be remedied." *See Lilley*, 719 A.2d at 330; *Z.P.*, 994 A.2d at 1117.

Finally, we consider whether Children's needs and welfare are met by termination pursuant to Subsection (b). *See Z.P.*, 994 A.2d at 1121. "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.*  The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. *Id.*  Ultimately, the concern is the needs and welfare of a child. *Id.*

We have stated:

Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parent's rights would destroy something in existence that is necessary and beneficial.

*Z.P.*, 994 A.2d at 1121 (quoting *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000)). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the children might have with their foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. *Id.* "[A] parent's basic constitutional right to the custody and rearing of . . . her child[ren] is converted, upon the failure to fulfill . . . her parental duties, to the child[ren]'s right to have proper parenting and fulfillment of [the children's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (citations omitted).

Mother argues that Children's needs and welfare are not best served by termination because she has a loving bond with Children. *See* Mother's Brief at 50-51. However, the trial court aptly observed:

After reviewing the testimony and considering the exhibits, this [c]ourt finds that the termination of Mother's rights will serve the best interests of the children. In this case, the children see a trauma therapist once a week. Their therapist, Marta Smith, testified as to the detrimental effect being reunited with Mother

will have on the children. Both children have been diagnosed with [PTSD], based on the experiences they had with Mother and Father. Ms. Smith testified that it would be detrimental to reunite the children with their Mother until [they] have completed trauma therapy. She testified that the children do not trust Mother, and that they have not made any statements about wanting to see her. She further testified that Mother's admission that she continues to have contact with Father only strengthens her opinion that the children should not be reunited with Mother. The record shows that the children look to their grandparents to fulfill their needs. Further, Ms. Kauffman-Jacoby testified that the children have a loving and strong bond with their grandparents. Both testified that the only thing that would be detrimental to the children would be reunification with Mother and separation from their grandparents.

Trial Court Opinion, 2/5/19, at 11-12 (citations to the record omitted).

We once more find no error of law or abuse of discretion in the trial court's conclusion. The record confirms that Children's needs and welfare are met by Maternal Grandparents, who ensure that Children are in therapy, attending school, and participating in activities. Maternal Grandparents attended therapy to address their own issues, and have progressed in that regard and in their relationship with Children. Children appear ambivalent about their future relationship with Mother. Although Children wish to maintain contact with Mother, they also expressed apprehension about such contact. Further, Children's legal counsel articulated Children's desire to remain with Maternal Grandparents and be adopted by them.

Accordingly, we discern no abuse of discretion in the trial court's conclusion that Children's needs and welfare are best served by termination. In sum, clear and convincing evidence supports the trial court's termination of Mother's parental rights under Section 2511(a)(2), as well as the Section

2511(b) findings that any bond between Children and Mother is outweighed by the fact that adoption would best serve Children's needs and welfare. *See Z.P.*, 994 A.2d at 1126-27; *K.Z.S.*, 946 A.2d at 763.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/10/2019