J-S12030-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: N.M.P.-C., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.C., FATHER | : : : : : : : : | |
| | : | No. 95 EDA 2025 |

Appeal from the Decree Entered December 17, 2024
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  2023-A0116

BEFORE:  STABILE, J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:               **FILED MAY 14, 2025**

J.C. ("Father") appeals from the order terminating his parental rights to his child N.M.P.-C. ("Child"). He argues the court erred in finding termination proper under 23 Pa.C.S.A. §§ 2511(a)(1) and (b) and challenges the preclusion of testimony. We affirm.

In August 2023, R.P. ("Mother") and Mother's husband, W.O., filed a petition for involuntary termination of Father's parental rights.[1]

The trial court held a hearing, where it heard testimony from Mother, W.O., Father's adult daughter G.C., Father's wife M.C., and Father. At the time of the hearing, Child was 14 years old. Mother testified that she and Father divorced in 2014. N.T., Nov. 28, 2023, at 7. She said that they entered a custody agreement giving Father custody one weeknight after school and one

_____

[1] Mother and W.O. also filed a petition for adoption of Child.

overnight every other month. *Id.* at 8. She testified that Father did not consistently pick Child up on his weeknight and never exercised custody for an overnight visit. *Id.* at 8. She further testified that Father was not consistent with his child support payments. *Id.* at 8-9.

Mother testified that in June 2016, when Child was seven years old, the parties entered into an agreement ("2016 agreement") in which Father agreed to give up his custodial visits and legal rights, such that Mother would have sole physical and legal custody of Child. In exchange, Mother agreed that Father would not be obligated to pay child support. *Id.* at 11.

Mother testified that since the 2016 agreement, Father has not called, texted, or sent letters to Child. *Id.* at 13. She stated that Father did generally send Child a birthday card each year. *Id.* She testified Father has not attended Child's school or extracurricular events or doctor or dentist appointments. *Id.* at 14. Mother testified that in December 2016, she responded to an email from Father and asked Father to "give [Child] time," and that if he would "commit to only seeing [his] parents," with his daughter G.C., and not his wife, Mother would consider visitation. *Id.* at 15. Mother stated that after that email, she did not hear from Father until 2020. *Id.* She testified that Father emailed Child in February 2020, when Child's paternal grandfather was dying, but that neither Mother nor Child saw the email at that time. *Id.* at 16-17. Mother stated that Father requested a visit in November 2022, so Child could see paternal grandmother, but Child did not want to go. *Id.* at 18-19. She said that he emailed Child another time, in February 2023. *Id.* at 21. However,

Mother stated that since 2016, he has never asked for custody and he requested a visit "maybe two times." *Id.* at 20.

On cross-examination, Mother agreed that a provision of the 2016 agreement stated that if Father "file[d] a petition . . . seeking any form of custody . . . the support order dated December 1, 2014, shall be reinstated" along with accumulated arrears, which Father would be required to pay within 90 days of the filing of the petition to modify custody. *Id.* at 25.[2] She further acknowledged that the 2016 agreement stated that the 2016 agreement would not, "in and of itself," be a basis for "Mother to seek an involuntary termination of Father's parental rights":

> Father's waiver of custodial rights in this stipulation shall not form a basis in and of itself for Mother to seek an involuntary termination of Father's parental rights through a legal proceeding in Orphans' Court. However, should Father's actions, separate and apart from the terms of this

---

[2] The 2016 agreement provided:

> In the event Father files a Petition with the Court seeking any form of custody (whether legal or physical), the Support Order dated December 1, 2014 shall be reinstated, effective as of the date of this Stipulation for Agreed Order. Any and all arrears that would have been generated on the December 1, 2014 Support Order between the date of this Stipulation for Agreed Order and the date Father files his Petition to Modify Custody shall be due and owing within ninety (90) days of the date of the filing of the Petition to Modify Custody. In addition, any arrears balance that was due as of the date of this Stipulation for Agreed Order shall be reinstated and Father shall be obligated to pay Mother said arrears balance within six (6) months of the filing of any Petition to Modify Custody.

Trial Exh. at 7.

stipulation, support a legal basis under Pennsylvania law to terminate his parental rights, Mother shall be permitted to file petition seeking to terminate Father's parental rights.

*Id.* at 27-28; Trial Exh. at 7.

W.O. testified he and Mother married in November 2022. N.T., Nov. 28, 2023, at 51. He stated they have been together for 13 years. *Id.* at 52. W.O. testified he had "[t]he best" relationship with Child. *Id.* He agreed he had a criminal record, including "thefts [and] probation violations," and he had been "on drugs for a long time." *Id.* He said he had been incarcerated "multiple times," with the last time being "in 2016," with his release in 2018. *Id.* He testified he has not had criminal violations since 2018 and had been sober for seven years. *Id.* W.O. testified that he and Child go out to breakfast every weekend and go to the beach and he listed her activities and her favorite food, subject, friend, and musical artist. *Id.* at 53-54. W.O. testified that he intended to adopt Child if Father's rights were terminated. *Id.* at 53.

Father's adult daughter G.C. testified that Father "has had a bond with [Child] . . . and . . . just need[s] to create the bond again." *Id.* at 71. She stated that when Child was young, G.C. "ha[d] a lot of great memories with her," and she misses that. *Id.* In addition, Father's wife, M.C., testified that Father and Child had a positive relationship and that he was a "great father." *Id.* at 75. She stated that Child "loved coming to [their] house," and that M.C. enjoyed a positive relationship with Child. *Id.* at 78. M.C. agreed that when Father relinquished his custodial rights, she had been supporting Father financially. *Id.* at 80.

Father testified that he and Mother separated when Child was two. *Id.* at 86. He stated he owned a hair salon and was in "dire straits" financially at the time of separation. He said he was "work[ing] to try to pay the bills and make sure [his] other employees . . . would get their paychecks," so there would "be weeks [he'd] go by with no paycheck." *Id.* at 83, 88-89. He testified that he was working a lot, which impacted his decision to not seek additional child custody time. *Id.* at 90. He testified he agreed to give up custody in exchange for not paying child support because he was not "able to really keep up with the support" and "[a]ny time [he] was a day late, [he'd] get dragged into court." *Id.* at 91. Father explained that, under the 2016 agreement, if he sought custody, he would have owed arrears and all past due payments would be due within 90 days. *Id.* at 94.

Father testified that he "tried many times" to have visitation with Child, but Mother did not honor the requests. *Id.* He stated he did not file anything with the court because it would "open up a custody agreement," and he was not prepared to pay for the litigation. *Id.* at 95. He testified that he and Mother had a verbal agreement that he could take Child to visit his parents, but he did not get responses when he reached out to Mother or Child. *Id.* at 95-99. He stated that he sent Child a birthday card every year. *Id.* at 99. He testified that his attempts to communicate with Child continued during the six-month period leading up to the filing of the petition. *Id.* at 100. He stated he had a "very deep" and "very good" bond with Child and he "love[s] her dearly." *Id.* at 104.

The trial court terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1) and (b). Father filed a timely appeal.

Father raises the following issues:

> 1. Whether sufficient evidence supported the termination of parental rights of Appellant Father based on 23 Pa. C.S.A § 2511(a)(1) where the Appellant Father had continued reaching out to the child within the six months immediately preceding the filing of the petition to terminate his parental rights?
>
> 2. Whether the Trial Court erred in finding there was no bond with Appellant Father and whether the child's needs and welfare pursuant to 23 Pa. C.S.A §2511(b) would be met by the termination of Father's parental rights?
>
> 3. Whether the Trial Court erred when it precluded the admission of evidence concerning the proposed adoptive father's drug addiction as a risk to the child?

Father's Br. at 4 (suggested answers omitted).

We review an order involuntarily terminating parental rights for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa.Super. 2018). In termination cases, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). We will reverse a termination order "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of S.P.*, 47 A.3d at 826.

- 6 -

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. ***In re Adoption of K.C.***, 199 A.3d at 473. Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." ***Id.*** (citation omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. ***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007). Under this provision, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***Id.*** (citations omitted).

Father first argues the trial court erred in finding termination proper under subsection 2511(a)(1). He maintains that the evidence established that he "persistently sent communications" and was insufficient to prove that he demonstrated a settled purpose of relinquishing his parental rights to Child.

Father's Br. at 7, 11. He points out that he sent a birthday card within the six-month look-back and argues the card "represented the latest action in a persistent chain of efforts by . . . Father to maintain a bond with his daughter." *Id.* at 9. He argues that when viewed in context, the card "precludes a finding that [Mother] proved the statutory requirements of Section 2511(a)." *Id.* at 9, 10. Father claims his actions, although not reciprocated by Child or Mother, "show that he intended to continue to hold himself out to the child as a parent, available to meet her emotional needs and offer love and support." *Id.* at 11.

Father also argues that the trial court erred because it did not consider allegations that Mother prevented Father's messages from reaching Child. *Id.* He claims such allegations were relevant to determine whether Mother had proved he demonstrated a settled purpose to relinquish parental rights. He maintains "Mother cannot block . . . Father's messages, then assert that his failure to communicate with the child evidenced a settled purpose to relinquish on his part." *Id.* at 12.

Father further maintains the trial court erred when it considered evidence of his absence from Child's life. He argues that, pursuant to the 2016 agreement, the parties agreed he would forfeit his custodial rights and that Mother would waive any child support obligation. He points out that the Agreement stated that the waiver of rights standing alone would not form a basis for involuntary termination of his parental rights. He argues that Mother therefore should not be able to argue that his failure to perform custodial actions form the basis for termination. He maintains that if the court was able

to consider such actions, it was error to not give greater weight to his poor financial condition, "which explained his willingness to enter the June 2016 custody agreement." *Id.* at 15. He notes that under the agreement, if he sought custody he would owe all applicable support payments, which he would not be able to pay. *Id.* at 16.

Here, the court found termination proper under subsection 2511(a)(1), which provides that a parent's rights to a child may be terminated if:

> The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

Under subsection 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008). A parental obligation is a "positive duty which requires affirmative performance" and "cannot be met by a merely passive interest in the development of the child." *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003) (citation omitted). Indeed,

> [p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path

of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004) (citations omitted).

Here, the trial court concluded the evidence established, by clear and convincing evidence, that Father failed to meet his parental duties during the six-month period:

> The evidence in this case demonstrates that for the last six months, the [F]ather has failed to meet his parental duties. Your actions will always speak louder than your words ever will.

> During this trial, [the court] heard a lot of finger pointing to blame others for the broken relationship with [Child], but never heard any accountability on [Father's] end. Since February 2023, [Father] made the conscious decision not to attend any doctor appointments, dentist appointments, parent teacher conferences, school shows, extracurricular activities.

> A single card or email does not equate to performing parental duties. Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights for a period of at least six months preceding the filing of the petition, the [c]ourt must engage in three lines of inquiry: The parent's explanation for his or her conduct, the post-abandonment contact between parent and child, and consideration of the effect of termination of parental rights on the child pursuant to Section 2511 (b).

> . . .

> There was no evidence presented . . . to show that a good-faith effort was made to maintain the parent/child relationship. There was no evidence to suggest that any reunification counseling or other services were sought to help a young girl who had no relationship, through no fault of her own, for a few years. There was no evidence presented that any extended family members reached out

> to connect with this young girl to maintain a familial relationship.

N.T., Nov. 28, 2023, at 128-130.

The trial court did not err in concluding termination was proper under subsection 2511(a)(1). Father failed to perform any parental duties in at least the six months preceding the filing of the petition. Although he sent a birthday card, he made no effort to be an active part of Child's life. Although the 2016 agreement stated that the agreement could not be the sole basis for termination of parental rights, it also said that parental rights could be terminated if Father's actions separate from the agreement provided a basis for termination. Here, the court did not rely on the 2016 Agreement to terminate Father's parental rights. Rather, it relied on Father's conduct. Although Father testified that Mother prevented him from communicating with Child, Mother provided differing testimony. The court did not err in not crediting Father's testimony. This claim lacks merit.

Father next maintains that the court erred in concluding that he and Child did not have a parent-child bond. He argues his testimony, coupled with the testimony of his wife and adult daughter, established that he and Child shared a parent-child bond. He claims he presented testimony about family gatherings and activities they enjoyed.

Under section 2511(b), the trial court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the best interest of the child. *See* 23 Pa.C.S.A. § 2511(b). This inquiry involves assessment of "[i]ntangibles

such as love, comfort, security, and stability[.]" ***In re C.M.S.***, 884 A.2d 1284, 1287 (Pa. Super. 2005). The court must also examine the parent-child bond, "with utmost attention to the effect on the child of permanently severing that bond." ***Id.*** The court must also examine any pre-adoptive home and any bond between the child and the foster parents. ***In re T.S.M.***, 71 A.3d at 268.

Here, the trial court concluded no bond existed between Father and Child and that Child would not suffer a detriment if Father's parental rights were terminated:

> In this case, the testimony clearly established that there is no parental bond between the child and [F]ather. [F]ather has not provided a home, has not meet [Child's] needs, and has not maintained a consistent and strong parent/child relationship. His desire to start over at this time is insufficient to meet [Child's] needs for consistent and reliable love, affection, and responsibility.

> [F]ather testified that he and [Child] shared a strong bond, yet, he offered not one personal story or connection with his daughter. [The court] conclude[d] that the emotional needs and welfare of [Child] can best be met by termination of the parental rights of [F]ather and that [Child] will not suffer a detriment as a result of termination of the parental rights of her [F]ather.

> By contrast, [the court] f[ou]nd that a bond has developed between the stepfather and [C]hild that has been described as very strong. The stepfather was able to name her class, her teacher's name, her best friend, her favorite musical artist, and her favorite breakfast food. Therefore, I find from the evidence and testimony that termination of the [F]ather's rights best serve the needs and welfare of [C]hild and termination of the parental rights from [F]ather will not irreparably harm [C]hild.

N.T., Nov. 28, 2023, at 132-133.

The trial court did not err in finding termination proper under Section 2511(b). Father and his witnesses claimed that Father had a bond with Child. However, he presented no evidence to support this claim. The claim lacks merit.

In his last issue, Father argues that the trial court erred when it precluded evidence of W.O.'s alleged risk to Child. He maintains that when he attempted cross examine W.O. about the dangerousness of heroin, the trial court sustained Mother's objection, which he argues was error. He claims the dangerousness of heroin was relevant because it concerned W.O's drug addiction. He argues that "[s]hould proposed adoptive father relapse into consuming the illicit substance, he would dramatically increase the chances of harm befalling the child in a number of ways." Father's Br. at 18. Father further argues it was error for the court to sustain the objection to testimony concerning W.O.'s potential "wanted" status. He claims this was "admissible for the purpose of establishing witness bias or impeaching his credibility." *Id.* at 19.

"[T]he decision of whether to admit or exclude evidence is within the sound discretion of the [trial] court." *In re A.J.R.-H.*, 188 A.3d 1157, 1166-67 (Pa. 2018). We will not disturb the trial court's ruling unless it has abused its discretion, that is, when it has overridden or misapplied the law. *Id.* at 1167.

During cross-examination of W.O., the trial court sustained an objection to questions regarding whether W.O. was subject to a bench warrant regarding child support for his other daughter:

> Q. [W.O.], do you currently have custody of your daughter?
>
> A. I guess technically I do have custody rights with her. They have not been met. My ex has been in contempt. That's all I'm going to say.
>
> Q. Okay. Were you also recently the subject of a bench warrant concerning arrears owed in child support?
>
> [Mother's counsel]: Objection; that doesn't go to a capacity to parent at all. That's a financial issue, and it's not relevant to whether or not he can appropriately care for [Child].
>
> [Father's counsel]: I didn't intend to ask about arrearages and bench warrants, Judge, but the witness's response was not really responsive to my question. He offered that she was contempt, and I think he had said for a financial issue.
>
> [Mother's counsel]: He did not say that.
>
> THE COURT: He didn't say that. He did not say that.
>
> [Father's counsel]: Regardless, Judge, when he offers that the mother of his other child is in contempt, it naturally calls into question whether or not he is in good standing with the Court. And it's my understanding a bench warrant has been issued concerning an arrearage of child support.
>
> [Mother's counsel]: His question was about their custody schedule and the answer was: Yes, I do, but my ex is currently in contempt of their current custody order which has nothing to do with their support order.
>
> So he was answering the question. He was asked if he had custody of his daughter and he said: Yes, I do, but my ex is in contempt.
>
> THE COURT: Yeah. I'm going to sustain that objection.

N.T., Nov. 28, 2023, at 60-61.

- 14 -

Further, on direct examination, W.O. testified that he was a drug addict and had been sober since 2016 and that he had convictions and had been incarcerated, with his most recent release date being 2018. On cross-examination, counsel asked about heroin and whether it was dangerous:

Q. What were the substances with which you dealt with an addiction issue?

A. Opiates.

Q. And specifically?

A. Opiates in general.

Q. Just general. Okay.

Did your consumption of opiates include the consumption of heroin or fentanyl?

A. It's an opiate; isn't it?

Q. It is, but there's obviously others, so I just want to be clear.

A. Okay.

Q. And I don't mean to be insensitive about it.

A. It's no big deal.

Q. We can agree that heroin and fentanyl are --

A. Never used fentanyl.

Q. I'm sorry?

A. Never touched fentanyl.

Q. My apologies. Heroin?

A. It might have been in there.

Q. We could agree that heroin is an extremely dangerous?

[Child's counsel]: I'm going to object.

- 15 -

[Mother's counsel]: Again, object to relevance.

He's been clean since 2016. This has nothing to do with 2023, Judge.

THE COURT: Counsel.

[Defense counsel]: Judge, drug addiction is a lifelong issue. I think that [W.O.] would agree that it's a matter with which he has to be personally concerned and not let down his guard, and it concerns the welfare of the child. A person with an addiction issue is more likely to potentially bring in a drug of this nature into the house. So it is relevant.

[Mother's counsel]: It's mere speculation. He has been sober since 2016. He's a functional member of society.

There's no inclination or nothing to suspect that there is an ongoing drug problem. It's merely trying to denigrate [W.O.] because he wants to adopt this child. There's nothing relevant in that question.

THE COURT: I'm going to sustain the objection. So don't answer that.

*Id.* at 62-64.

The court did not abuse its discretion. The court permitted questioning as to whether W.O. had custody of W.O.'s child, but sustained an objection to questioning regarding W.O.'s payment status as to child support. The court did not abuse its discretion in finding such testimony was not relevant to whether Father's parental rights to Child should be terminated. Similarly, the court heard testimony that W.O. was a recovering drug addict who had a criminal record. The court did not abuse its discretion in sustaining the objection to a question about whether heroin was dangerous, as it was not relevant to whether Father's rights should be terminated.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>5/14/2025</u>